## BALFOUR, GUTHRIE & CO. v. UNITED STATES.

### Customs Appeal No. 4423.

Court of Customs and Patent Appeals.

July 6, 1943.

Lawrence & Tuttle, of San Francisco, Cal. (Frank L. Lawrence and George R. Tuttle, both of San Francisco, Cal., of counsel), for appellant.

Paul P. Rao, Asst. Atty. Gen. (Charles J. Miville, of New York City, Sp. Atty., of counsel), for the United States.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the judgment of the United States Customs Court, Third Division, overruling the protest of the importer against the assessment by the Collector of Customs at the port of Seattle, Washington, of certain duties on whiskey imported from Scotland.

There were two importations, one entered in November, 1939, and the other in April, 1940.

The collector assessed certain duties under paragraph 802 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, the duty rate being $2.50 per proof gallon in conformity with the trade agreement between the United States and the United Kingdom of Great Britain and Northern Ireland, T. D. 49753, 54 Stat. 1967, and internal revenue taxes were also assessed as provided by law.

As to those duties and taxes no protest was made, but in addition to those, the collector assessed duties at a rate equivalent to 3 (English) pence per proof gallon, and the protest is leveled against the duties so assessed. They were assessed as countervailing duties under section 303 of the Tariff Act of 1930, 19 U.S.C.A. § 1303, and in conformity with instructions issued by the Secretary of the Treasury, under authority of that section, on June 20, 1935.

The pertinent portion of the statute reads: "Sec. 303. Whenever any country * * * shall pay or bestow * * * any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country * * *, then upon the importation of any such article or merchandise into the United States * * * there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant * * *."

Since there is no controversy respecting T. D. 47753, it is unnecessary to quote it here. Briefly, it may be said that the Secretary found that the United Kingdom of Great Britain and Northern Ireland was paying a bounty of 3 pence per gallon on exported "Plain British Spirits," computed at hydrometer proof, and directed United States collectors of customs to collect additional duties equal to such bounty.

It has not been questioned during the progress of the case that at the time the importations were made bounty in the amount named was being paid by the United Kingdom and we take it to be conceded that such bounty was paid upon the whiskies here involved.

In its protest importer asserted, inter alia: "Countervailing Duty was illegally assessed because no bounty, grant, or

allowance was made within the meaning of section 303, or because the requirements of that section as to manner of assessment were not complied with, or *because such assessment contravenes the Canadian trade agreements, TD 48033 and 49752, and the British trade agreement,* TD 49753." (Italics ours.)

The italicized clause of the foregoing comprehends the issue as presented before us.

In appellant's brief it is said:

"The theory of this appeal is that the 'additional duty' authorized by section 303 has been suspended by the trade agreement between this country and the United Kingdom, which was entered into by the President and proclaimed by him, as provided by section 350(a), tariff act of 1930, as amended, 19 U.S.C.A. 1351.

"(3) British trade agreement: This compact was proclaimed by the President as effective on January 1, 1939, TD 49753, 54 Stat. 1897. One of its provisions, annotated to tariff paragraph 802, is for whiskey at $2.50 per proof gallon, in lieu of the rate of $5 per proof gallon fixed by that paragraph for distilled spirits. As the lower rate was assessed in this case, that part of the agreement is not here in controversy, and it is therefore necessary to determine only the status of the countervailing duty assessed as above stated under section 303."

So (reduced to simple terms), the question to be decided is whether the trade agreement (hereinafter referred to as the British trade agreement) affected or "wiped out" the countervailing duty statute embraced in section 303, so far as whiskey imported from the United Kingdom of Great Britain and Northern Ireland is concerned.

It was stipulated by counsel for the respective parties, in effect, that no countervailing duty has been assessed, at least at the port of Seattle, on whiskey imported from Canada or any other foreign country except England, since the act of 1930.

While "England" was named in the stipulation, we take it to be a fair assumption that "The United Kingdom of Great Britain and Northern Ireland" (of which Scotland is one unit) was, in fact, meant. We observe that in T. D. 47753 it is stated that "the bounties are paid by different units of the British Commonwealth of Nations."

We observe also that, in a sense, the stipulation is limited to transactions at the port of Seattle, but we assume that the practice was the same at all other ports—that is, we assume that countervailing duties, as provided in section 303, were not being levied at any port upon whiskies imported from any country except those imported from the United Kingdom of Great Britain and Northern Ireland, to which we hereinafter refer as the United Kingdom.

It must be assumed also that the reasons for not assessing, under section 303, countervailing duties upon whiskey imported from countries other than the United Kingdom was that no other country was paying a bounty upon whiskey exported from it to the United States.

We here quote the following from the British trade agreement:

"Article II

"1. Articles the growth, produce or manufacture of the territories of either High Contracting Party shall not be subjected, upon importation into the territories of the other, from whatever place arriving, to other or higher duties or charges of any kind or to any rules or formalities other or more burdensome than those to which the like articles the growth, produce or manufacture of any other foreign country are subject.

"2. Articles exported from the territories of either High Contracting Party to the territories of the other shall not be subjected to other or higher duties or charges of any kind or to any rules or formalities other or more burdensome than those to which the like articles exported to any other foreign country are subject.

"3. Any advantage, favor, privilege or immunity which has been or may hereafter be granted in the territories of either High Contracting Party in respect of any article originating in or destined for any other foreign country in regard to customs duties and other charges of any kind imposed on or in connection with importation or exportation, to the method of levying such duties or charges, to all matters concerning the rules, formalities and charges imposed in connection with importation or exportation, and to all laws or regulations affecting the sale or use of imported goods within those territories, shall be accorded immediately and unconditionally in respect of the like article originating in or destined

for the territories of the other High Contracting Party.

## "Article III

"Articles the growth, produce or manufacture of the territories of either High Contracting Party shall, after importation into the territories of the other, be exempt from all internal taxes, fees, charges or exactions other or higher than those payable on or in connection with like articles of domestic or any other origin, except as otherwise required by laws in force on the day of the signature of this Agreement and subject, in the case of the United States of America, to the constitutional limitations on the authority of the Federal Government.

\* \* \* \* \*

## "Article VI

"All the provisions of this Agreement providing for most-favored-nation treatment shall be interpreted as meaning that such treatment shall be accorded immediately and unconditionally, without request or compensation.

\* \* \* \* \*

## "Article XII

"Articles the growth, produce or manufacture of any of the territories to which this Agreement applies on the part of His Majesty the King, enumerated and described in Schedule IV annexed to this Agreement, shall, on their importation into the United States of America, from whatever place arriving, be exempt from ordinary customs duties other or higher than those set forth and provided for in the said Schedule IV, subject to the conditions therein set out. The said articles shall also be exempt from all other duties, taxes, fees, charges or exactions of any kind, imposed on or in connection with importation, in excess of those imposed on the day of the signature of this Agreement or required to be imposed thereafter under laws of the United States of America in force on the day of the signature of this Agreement.

\* \* \* \* \*

## "SCHEDULE IV

\* \* \* \* \*

"In the case of any article enumerated in this Schedule, which is subject on the day of the signature of this Agreement to any additional or separate ordinary customs duty, whether or not imposed under the statutory provision noted in the column at the left of the respective description of the article, such separate or additional duty shall continue in force, subject to any reduction indicated in this Schedule or hereafter provided for, until terminated in accordance with law, but shall not be increased."

In appellant's brief it is said:

"In article II of the agreement, paragraph 1 provides that manufactures of either country, upon importation into the other country:

" 'Shall not be subjected \* \* \* to other or higher duties or charges of any kind or to any rules or formalities other or more burdensome than those to which the like articles the \* \* \* manufacture of any other foreign country are subject.'

"This is an unconditional most-favored-nation clause, such as is referred to in article VI and there made self-executing rather than executory, by the following language:

" 'All the provisions of this Agreement providing for most-favored-nation treatment shall be interpreted as meaning that such treatment shall be accorded immediately and unconditionally, without request or compensation.'

"Above-quoted provisions are supplemented by article IV(1), prescribing:

" 'No prohibition or restriction shall be imposed or maintained on the importation into the territories of either High Contracting Party of any article from whatever place arriving, the growth, produce or manufacture of the territories of the other High Contracting Party, to which the importation of the like article the growth, produce or manufacture of any other foreign country is not similarly subject.' "

Based upon the foregoing, appellant argues that the countervailing duty collected in this case was imposed in violation of the most-favored-nation clause and other provisions of the British trade agreement, which forbid discriminatory duties, and urges that the decision of this court in the case of John T. Bill Co., Inc., v. United States, 104 F.2d 67, 70, 27 C.C.P.A., Customs, 26, C.A.D. 57, is controlling in this case.

We deem it proper to state, first, the distinction between that case and this.

Section 303 of the Tariff Act of 1930 was not involved in that controversy, nor

were any trade agreements negotiated under the Act of June 12, 1934, 48 Stat. 943, amending the Tariff Act of 1930 in order to authorize such agreements, involved. The merchandise there involved was imported in July, 1931, and in May, 1934, and the protests were predicated upon the treaty between the United States and Germany promulgated October 14, 1925, 44 Stat. 2132, after ratification by the Senate of the United States and the German Government.

The merchandise consisted of bicycle parts imported from Germany. They were classified under paragraph 371 of the 1930 act, 19 U.S.C.A. § 1001, par. 371, which fixed a normal duty rate of 30 per centum ad valorem for such articles, but which contained a proviso, reading: "Provided, That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, in excess of the duty herein provided, there shall be imposed upon such article, when imported either directly or indirectly from such country, dependency, province, or other subdivision of government, a duty equal to that imposed by such country, dependency, province, or other subdivision of government on such article imported from the United States, but in no case shall such duty exceed 50 per centum ad valorem." 48 Stat. 944.

It was found by the customs officials that at the times of the exportations of the merchandise from Germany, that country was imposing a duty upon similar merchandise when imported into Germany from the United States (and, so far as the record shows, from all other countries) in excess of 30 per centum ad valorem, and duties were assessed, under the proviso of paragraph 371, supra, at the rate of 50 per centum ad valorem.

We held that, by reason of the character of the treaty with Germany (which it is unnecessary to redescribe here) the normal rate of 30 per centum was applicable.

In our decision we referred to the proviso above quoted as "the countervailing duty provision of paragraph 371." It was, in effect, so referred to by the trial court and in the briefs of counsel, and, it may be added, that one of the Treasury Decisions (T. D. 46329) respecting it was entitled "Countervailing Duties." The term "contingent" would have been more appropriate

than the term "countervailing," and we think it should be pointed out here that the term "countervailing" was not used in the paragraph itself, nor was it used in paragraphs 401, 1650, 1687, and 1803, 19 U.S.C. A. § 1001, par. 401, § 1201, pars. 1650, 1687, 1803, which paragraphs contained provisos similar in meaning to that in paragraph 371, supra. The only place in the act where the term is used is in connection with section 303, supra, and the duty therein required to be levied because of the payment of bounties is defined as "an additional duty," a phrase not used in any of the paragraphs above named.

The point we seek to emphasize is that we did not have before us in the Bill Co. case, supra, any question concerning bounty or any question relating to duty levied on account of bounty.

In the course of its decision in the instant case, the trial court directed attention to the fact that in the Reciprocal Trade Agreement Act of June 12, 1934, Congress expressly repealed the provisos of paragraphs 371, 401, 1650, 1687, and 1803 of the Tariff Act of 1930, but did not repeal section 303 of the act.

We quote from its decision as follows:

"It is noted that the Reciprocal Trade Agreement Act as enacted repealed the contingent duty provisos in paragraphs 371, 401, 1650, 1687, and 1803, apparently because of a realization of the fact that the assessment of such contingent duties was in violation of most-favored-nation clauses in treaties. Section 303, however, the true countervailing duty provision in the act, was not repealed.

"The Committee on Ways and Means in its report on the bill, being report No. 1000 (To accompany H. R. 8687) used the following language, in connection with the repeal of these provisos:

"'Under the present bill certain provisions of the Tariff Act of 1930 are repealed. These provide for what are known as contingent duties. Contingent duties are those which depend upon and vary in amount in accordance with the amount of duty placed upon the particular article in the tariff laws of other countries. Under the principle of equality of treatment, the duty which a country charges on a given product must be the same to all countries. This is required by the most-favored-nation clause. What the needs of a particular country are with reference to the height of

duties usually bears little relationship to the needs of some other country with respect to duties upon the same types of articles. Contingent duties, accordingly, are not recognized as fulfilling a legitimate purpose, and are clearly in violation of the most-favored-nation clause.

" 'No other country, with perhaps a single exception, maintain such duties. The United States cannot maintain them without violating its treaty pledges. The present bill is based upon the conception of equality of treatment and absolute integrity of international obligations. The contingent duties are clearly inconsistent with it and must be repealed as a part of an act which is designed to carry out the purpose of the present one.

" 'Contingent duties are to be sharply distinguished from countervailing duties. Countervailing duties are imposed for the purpose of neutralizing the effect of subsidies or bounties granted upon the production or export of the goods which may be imported into the United States. *Nothing in the present bill interferes with the full operation of section 303 of the Tariff Act of 1930, under which countervailing duties are and will continue, where necessary, to be levied.* (Italics ours.)

" 'Similarly, there is no interference with the Antidumping Act of 1921, under which protection is afforded against the dumping of goods into the American market. Both antidumping duties and countervailing duties are generally recognized as legitimate exceptions to the obligations of the most-favored-nation clause * * *.'

"It will thus be seen that the distinction between contingent duties and countervailing duties is well recognized. It there-fore follows that the decision in the John T. Bill case, supra, relied on by the plaintiff, is not controlling of the issue here presented."

We are in entire agreement with the holding of the trial court to the effect that nothing said in the decision in the Bill Co. case, supra, is controlling of the issue here presented.

We are also in agreement with the court's holding to the effect that there is nothing in the British trade agreement which indicates that it was intended to modify, or in anywise affect, the assessment of countervailing duties as provided in section 303, supra.

By reference to Article XII of the agreement quoted, supra, it will be seen that it refers, first, to *"ordinary* customs duties," and, second, to *"all other duties,"* etc. (Italics ours.) The first clause—ordinary duties—as related to this case made applicable a rate of $2.50 per proof gallon on whiskey as fixed in the agreement rather than the rate of $5 per proof gallon as fixed in the statute. The second clause, relating to all other duties, etc., apparently had the effect, so far as here important, of "freezing" such duties at the rate in effect at the time of the signing of the agreement, but it did not provide for a discontinuance of the levy under section 303, supra.

We do not think it was intended so to provide.

The judgment is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.