## THE COLLECTOR *v.* RICHARDS.

The act of May 22d, 1846, enacting that "in all computations at the custom-house, the franc of France . . . shall be estimated at eighteen cents and six mills," is repealed by the act of March 3d, 1873, "to establish the custom-house value of the sovereign or pound sterling of Great Britain, and to fix the par of exchange," the first section of which act enacts:

"SECTION 1. That the value of foreign coin, as expressed in the money of account of the United States, shall be that of the pure metal of such coin or standard value, and the values of the standard coins in circulation of the various nations of the world shall be estimated annually by the Director of the Mint, and proclaimed on the 1st day of January by the Secretary of the Treasury."

"SECTION 3. That all acts and parts of acts inconsistent with these provisions be, and the same are hereby, repealed."

*Held,* accordingly, that the Director of the Mint having estimated the value of the franc of France at nineteen cents and three mills, and the Secretary of the Treasury having on the 1st of January, 1864, proclaimed it as of that value accordingly, goods invoiced in French francs and entered in a custom-house here in March of that year, were to be charged at the new valuation of the franc.

ERROR to the Circuit Court for the Southern District of New York.

Richards sued Arthur, collector of the port of New York, at law in the court below, to recover an alleged excess of duties on imported goods exacted by the defendant and paid by the plaintiff under protest. Judgment was given in favor of the plaintiff, and to reverse this judgment this writ of error was brought.

The case was thus:

On the 16th day of March, 1874, the plaintiff, Richards, entered at the custom-house an invoice of all-wool dress-goods imported from France, the value of which was invoiced in francs of the currency of France. By an act of Congress passed May 22d, 1846,* it was enacted that "in all computations at the custom-house, the franc of France . . . *shall* be estimated at eighteen cents six mills." At this rate of estimation of the French franc in money of account

---

* 9 Stat. at. Large, p. 14, § 1.

of the United States, the dutiable value of these goods was less than twenty cents per square yard, and under the then existing tariff, subject to an *ad valorem* duty of thirty-five per cent., and an additional duty of six cents per square yard. The plaintiff contended that this act of May 22d, 1846, fixed the value of the franc, and accordingly that he was chargeable only at the rate of eighteen cents six mills for each franc.

On the other hand the defendant relied on the act passed March 3d, 1873, entitled "An act to establish the *custom-house value of the sovereign or pound sterling of Great Britain*, and to fix the par of exchange;"* by which it was enacted as follows:

"SECTION 1. That the value of foreign coin, as expressed in the money of account of the United States, shall be that of the pure metal of such coin of standard value, and the values of the, standard coins in circulation of the various nations of the world shall be estimated annually by the Director of the Mint, and proclaimed on the 1st day of January by the Secretary of the Treasury.

"SECTION 2. That in all payments by or to the treasury, whether made here or in foreign countries, when it becomes necessary to compute the value of the sovereign or pound sterling, it shall be deemed equal to $4.86 and 6½ mills, and the same rule shall be applied in appraising merchandise imported, when the value is by the invoice in sovereigns or pounds sterling, and in the construction of contracts payable in sovereigns or pounds sterling; and this valuation shall be the par of exchange between Great Britain and the United States; and all contracts made after the 1st day of January, 1874, based on an assumed par of exchange with Great Britain, of fifty-four pence to the dollar, or $4.44⁴⁄₉ to the sovereign or pound sterling, shall be null and void.

"SECTION 3. That *all acts and parts of acts inconsistent with these provisions be, and the same are hereby, repealed.*"

Under this act the superintendent of the mint prepared two tables, one showing the standard value of foreign coins

* 17 Stat. at Large, 602.

and moneys of account, according to the amount of pure metal contained therein, as provided in the first clause of the first section; and the other, showing the weight, fineness, and value of certain foreign coins in actual circulation, as assayed at the mint, exhibiting a slight diminution of the values contained in the first table. The Secretary of the Treasury, by a circular letter addressed to the collectors of the customs, declared that the values contained in the first of these tables would be used in the computation of customs duties from and after the 1st of January, 1874. This made the value of the franc nineteen cents and three mills, which carried the dutiable value of the plaintiffs' goods above twenty cents per square yard, and subjected them, in consequence, to an *ad valorem* duty of forty per cent., and an additional duty of eight cents per square yard. The collector required the plaintiff to pay duties in accordance with the latter valuation. This he did under protest, and now brought, as already said, this suit to get back the value.

The question thus was whether the effect of the first and third sections of the above-quoted act of 1873 was to repeal the act of 1846, and to substitute in all computations at the custom-house for the valuation of foreign coins, which had been previously prescribed by statute, the valuation according to standard value, annually estimated by the Director of the Mint and proclaimed by the Secretary of the Treasury.

It was asserted by the importer in the argument and not denied by the government, that the effect of the construction sought to be established by the government, would be materially to increase the amount of duties imposed by the *ad valorem* tariff, where the rate was upon a sliding scale in proportion to the value of the article. The duty was raised upon one class of articles eighteen per cent.; upon another class twenty-five per cent.; upon other classes still more highly; and the aggregate result would be to increase the amount of duties annually millions of dollars.

The opinion of the court below was that the first section of the act of March 3d, 1873, and the act of May 22d, 1846, did not cover the same subject; and that the latter act was

not repealed; and accordingly that in fixing the *dutiable* value of the goods under consideration, the old value of $18\frac{6}{10}$ cents fixed by the act of 1846 should have been given to the franc, and not the new value of nineteen cents and three mills given to it by the act of 1873.

The document presents so curious and interesting a history, and the facts which it collates show how much more difficult than from the language of the two statutes alone, might be imagined, was the question to be solved by this court, that the Reporter deems it worthy of preservation in this place.

The court below said:

"It is apparent, from an examination of the second section of the act of 1873, that the intention of Congress was to make a complete change for all commercial purposes in the valuation of the *pound sterling*. In addition to the provision 'that in all payments by or to the treasury, whether made here or in foreign countries,' the value of the sovereign shall be deemed equal to $4.86 and $6\frac{1}{2}$ mills; it is also expressly declared that 'the same rule shall be applied in appraising merchandise imported when the value is, by the invoice, in sovereigns or pounds sterling. Apt, appropriate, and definite language was here used to declare the radical change effected by the section and indicated by the title of the bill. The position of the defendant is, that the same change is wrought, in regard to the value of all other foreign coins of the various nations of the world, by the general provision of the first section—'the value of foreign coin, as expressed in the money of account of the United States, shall be that of the pure metal of such coin of standard value.'

"It was not denied upon the trial that the effect of this construction of the first section would be to materially increase the amount of duties imposed by the *ad valorem* tariff, where the rate is upon a sliding scale in proportion to the value of the article. Such a change, in regard to the pound sterling, was unmistakably intended and made by the second section of the act in question. If the same purpose existed in regard to other coins, why was not the intent expressed in similar decisive terms? The entirely different phraseology of the two sections of the act suggests the conclusion that the object of each section was not the same.

"In considering the question more closely, it is apparent that if the act of May 22d, 1846, and the other statutes which provide for the valuation of foreign coins in custom-house computations are repealed by the first and third sections of the act of March 3d, 1873, such repeal is by implication only.

"The rule in regard to repeals by implication is laid down in *United States* v. *Tynen*,* as follows: 'It is a familiar doctrine that repeals by implication are not favored. When there are two acts on the same subject, the rule is to give effect to both, *if possible*. But if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first, and even where two acts are not in express terms repugnant, yet, if the latter covers the whole subject of the first, and embraces new provisions plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act.' And in *Henderson's Tobacco*,† Mr. Justice Strong, in reasserting the rule, adds: 'It must be observed that the doctrine asserts no more than that the former statute is repealed so far as the provisions of the subsequent statute are repugnant to it, or so far as the latter statute, making new provisions, is plainly intended as a substitute for it.'

"In order, then, to ascertain whether the act of 1873 is a repeal by implication of the previous acts, upon the subject of the valuation for custom-house purposes, of foreign coins other than the pound sterling, an examination of the legislation of Congress in regard to foreign coins becomes necessary. Such examination discloses the fact, that from the earliest history of the government to a comparatively recent period, three classes of laws in regard to foreign coins have existed, each class having a distinct and separate object.

"The first class embraces those laws which were passed to fix the rate at which foreign denominations of money are to be computed in American money at the custom-house, for the purpose of ascertaining the dutiable value of imported merchandise. Congress commenced as early as 1789 the system of collecting a revenue by means of duties upon imported goods, the duties to be computed upon the values of the goods in currency of the United States. Foreign invoices stated the values in the

---

* 11 Wallace, 92.                              † 11 Id. 652.

currency of the respective countries from which the goods were imported, and it of course became necessary to transmute these values thus stated into the currency of this country. Hence the eighteenth section of the act of July 31st, 1789, which was an act to regulate the collection of duties upon imported goods, provided 'that all foreign coins and currencies shall be estimated according to the following rates: each pound sterling of Great Britain at four dollars forty-four cents; each livre tournois of France at eighteen cents and a half.' . . . Similar legislation was had in the acts of August 14th, 1790, of March 2d, 1799, and in various years thereafter, including the act of May 22d, 1846, until the second section of the act of March 3d, 1873, which as has been said, specifically provides that the valuation therein given to the sovereign shall be applied to the valuations stated in the invoices at the custom-house. The statutes of this class are those of July 31st, 1789, sec. 18;* August 4th, 1790, sec. 40;† March 2d, 1799, sec. 61;‡ March 3d, 1801, secs. 1, 2;§ July 27th, 1842, secs. 1, 2;‖ March 3d, 1843;¶ May 22d, 1846;** March 2d, 1861;†† March 3d, 1873, sec. 2.‡‡ Each of the various acts in this class either referred in direct terms to the valuation of foreign coins for custom-house purposes, or are parts of general statutes imposing duties upon foreign goods, and obviously relate exclusively to the appraisal of merchandise when the value is by the invoice in foreign coin. For example, the act of July 27th, 1842,§§ provides that in all payments by or to the treasury, when it becomes necessary to compute the value of the pound sterling, it shall be deemed equal to $4.84, 'and the same rule shall be applied to appraising merchandise imported when the value is by the invoice in pounds sterling.' The language used in other statutes is of the following kind: 'In all computations of the value of foreign moneys of accounts at the custom-house of the United States;' 'in the computation of duties;' 'in computation at the custom-house.' Congress thus adopted an exact, well-defined, and uniform system for the ascertainment at the custom-house of the dutiable value of foreign goods, which system, as will be seen, has always materially differed from the system of valuation placed upon foreign coins for the payment of debts.

---

* 1 Stat. at Large, 41.      † Ib. 167.        ‡ Ib. 673.
§ 2 Id. 121.                 ‖ 5 Id. 496.      ¶ Ib. 625.
** 9 Id. 14.                 †† 12 Id. 207.    ‡‡ 17 Id. 602.
§§ 5 Id. 496.

" In the infancy of the government, and until recently, foreign coin was in common circulation in this country. The duties under the revenue acts were payable in gold and silver coin, and hence it became necessary to establish the rates at which coin of other countries should be received in payment of debts to the government, and also as legal tender in payment of debts to individuals. Statutes establishing these rates constitute the second class of legislation on the subject of foreign coinage. Thus the thirtieth section of the act of July 31st, 1789, the same act from which I have heretofore cited, provided that 'the duties and fees to be collected by virtue of this act shall be received in gold and silver coin only, at the following rates, that is to say, the gold coins of France, England, Spain, and Portugal, and all other gold of equal fineness, at eighty-nine cents for every pennyweight.' The eighteenth section had provided that all foreign coins and currencies shall be estimated (for custom-house computations) according to a different rate. This section prescribed the rate at which coin shall be received in payment of duties the amount of which was ascertained by the aid of the eighteenth section. So the act of February 9th, 1793,* provided the rates at which foreign coins should be received as legal tender 'for the payment of all debts and demands;' and a series of statutes of the same character was passed, from time to time, until the act of February 21st, 1857.† But it was never supposed that this class of acts, passed for the purpose of establishing the value of foreign coin, when used in payment to the government or between individuals, had any relation to the first-mentioned class. The second series was enacted for a different object and purpose. For example, when Congress provided, by act of March 3d, 1843,‡ that the gold coins of Great Britain should be receivable by weight for the payment of all debts and demands at prescribed rates, such act evidently did not repeal the law of the previous year, by which the pound sterling was estimated for custom-house purposes.

" The second series of statutes existed until the act of February 21st, 1857,§ the third section of which act repealed 'all former acts authorizing the currency of foreign gold or silver coins, and declaring the same a legal tender in payment for debts.' The same section also provided that 'it shall be the duty of the

---

* 1 Stat. at Large, 300.     † 11 Id. 163.     ‡ 5 Id. 607.     § 11 Id. 163.

Director of the Mint to cause assays to be made from time to time of such foreign coins as may be known to our commerce, to determine their average weight, fineness, and value, and to embrace in his annual report a statement of the results thereof.' This provision was in .continuation of the third series of laws which had been passed on the subject of foreign coinage, whereby the mint was made the instrument for estimating the value of foreign coins.

"Perhaps the germ of this class of legislation may be found in the last clause of the act of February 9th, 1793,* the act . which established the rates at which foreign coins should be received as legal tender, and which clause provided that 'no foreign coin, that may have been or shall be issued subsequent to the 1st day of January, 1792, shall be a tender as aforesaid until samples thereof shall have been found by assay, at the mint of the United States, to be conformable to the respective standards required, and proclamation thereof shall have been. made by the President of the United States.' This provision simply had reference to the rate at which coins—the value of which was then unknown to Congress—should be received in payment of debts; but Congress thereafter provided, in the act of April 10th, 1806,† as follows: 'And it shall be the duty of the Secretary of the Treasury to cause assays of the foreign gold and silver coins made current by this act to be had at the mint of the United States at least once in every year, and to make report of the result thereof to Congress, for the purpose of enabling them to make such alterations in this act as may become requisite from the real standard value of such foreign coins. And it shall be the duty of the Secretary of the Treasury to cause assays of the foreign gold and silver coins of the description made current by this act, which shall issue subsequently to the passage of this act, and shall circulate in the United States, at the mint aforesaid, at least once in every year, and to make report of the result thereof to Congress, for the purpose of enabling Congress to make such coins current, if they shall deem the same to be proper, at their real standard value.'

"With the clauses of the act of 1806, just quoted, the third class of legislation in regard to coinage definitely commenced. This provision, passed for the purpose of furnishing information

---

* 1 Stat. at Large, 300.    † 2 Id. 374.

to Congress, by the aid of which proper alterations might be made in existing rates at which coins shall be received in payment of debts, continued until the act of February 21st, 1857, supplemented by similar acts of April 29th, 1816, June 25th, 1834, and March 3d, 1843. The act of February 21st, 1857, repealed all acts relating to the use of foreign coin as a legal tender, but continued the requirement upon the Director of the Mint to cause assays of foreign coins, to determine their average weight, fineness, and value, and to report annually to Congress the result of such assays. The object of this provision was not to ascertain the rates at which foreign coin should pass current in the country, for the use of foreign coin as currency ceased upon the passage of this statute, but it was obviously for the purpose of furnishing official information to Congress and to the various departments of government, so that their payments in foreign coin could be regulated, and to the public, so that courts and individuals should have accurate knowledge of the rate at which foreign coin should properly be estimated in our own currency. These provisions of the acts of 1806 and of 1857, continued until the act of March 3d, 1873, were annually complied with by the Director of the Mint, and, with the first class of laws, constituted, after 1857, the only two existing series of statutes on the subject of foreign coin.

" The question now is, whether the first section of the act of 1873 is a repeal of the first class of laws, and of the entire system of valuation of foreign coins for custom-house purposes, or is the establishment of a new principle for the valuation of foreign coins for other purposes, and an instruction to the Director of the Mint to make such new estimate in addition to, or in alteration of, the system of assays which had previously been the means of information which Congress and the public possessed in regard to the value of foreign coins.

" I cannot think that Congress intended in the first clause of the section to repeal the exact and uniform system of custom-house valuations which had existed since the year 1798, and to substitute therefor an entirely new system, by which the valuation of foreign coins was to be annually estimated and annually proclaimed. If Congress had intended such a change, it seems to me that they would have used apt and appropriate language, by which their intent would have been rendered obvious. Such language was within the reach of the draughtsmen, and it was

used in the second section. It is true that the language of the section in question is positive and broad, 'That the value of foreign coin as expressed in the money-account of the United States, shall be that of the pure metal of such coin of standard value,' but from the history of the legislation in regard to the subject of foreign coins, the intent and object of the laws seems to me to have been a modification of the third series of laws rather than of the first. Theretofore, the sole method of estimating values had been by assay of the coins in circulation; the Director of the Mint annually ascertained the average weight and fineness of the actual coin, and communicated the result to Congress. The valuation which these results placed upon foreign coins—the valuation known to the public, recognized by individuals, and by the departments of the government—'the valuation of foreign coin, as expressed in the money-account of the United States,' was, prior to the act of 1873, the average value of such coin in circulation as determined by annual assays. Congress now establishes a new rule by which the Director of the Mint is to be guided, and declares that the valuation which the government deems to be based upon a correct principle is the valuation of the ideal rather than the actual coin, and that thereafter the value shall be deemed that of the pure metal of such coins of standard value; and in order that Congress and the public shall have the knowledge of the valuations thus placed upon foreign coins, that the Director of the Mint shall annually estimate, and the Secretary of the Treasury annually proclaim, the result of the estimate.

"The former plan was to ascertain values by assays of the coin in use. That valuation was the official valuation furnished to Congress and the public. A new method and system of valuation is now prescribed to be made by the Director of the Mint, to wit, that the value of foreign coin expressed in money of account of the United States shall be that of the pure metal of such coin, and that the new rule shall be annually reduced to practice, and its results communicated by the Secretary of the Treasury for the benefit of the public. It may well be that Congress intended to impose upon the various departments the duty of making payments and of regulating their accounts with officers of the government abroad in accordance with the new rule. This official valuation annually proclaimed may be the one by which courts should estimate the value of coins men-

tioned in contracts which are the subject of litigation. I do not think that it was intended to be the standard of values in a department of business for which a special series of acts has always made provision, and in which a special system of valuation has always existed different from the valuation imposed upon foreign coins when used as a legal tender. The intent to repeal that series of acts does not plainly appear.

"It may be argued that the first section of the act under consideration is analogous to the provision contained in the sixty-first section of the act of March 2d, 1799, '*Provided*, That it shall be lawful for the President of the United States to cause to be established fit and proper regulations for estimating the duties on goods, wares, and merchandise imported into the United States in respect to which the original cost shall be exhibited in a depreciated currency, issued and circulated under the authority of any foreign government.' It is to be observed that the proviso of the act of 1799 had reference exclusively to the manner in which a confessedly depreciated currency issued under authority of any foreign government should be estimated, and was limited to such exceptional case. But, not to dwell upon this suggestion, the object of this proviso was upon its face avowedly for the purpose of ' estimating the duties on goods imported into the United States.' The question here is whether the first section had any such object in view; whether the object was not totally different. Because the act of 1799 specifically conferred upon the President the duty of establishing regulations for estimating the duties on goods in respect to which the cost shall be exhibited in a depreciated currency, it does not follow that the act of 1873 conferred upon the Secretary of the Treasury power to proclaim annually the value at which all goods shall be estimated when such power has not been conferred in terms.

"My conclusion is that the first section of the act of March 3d, 1873, and the act of May 22d, 1846, do not cover or embrace the same subject, and that the former section was not intended as a substitute for the act of 1846, and kindred statutes, but was intended for other and different purposes than those which are specified in the class of statutes of which the act of 1846 is a part. I am, therefore, of opinion that the act of May 22d, 1846, is not repealed, and consequently, in determining the dutiable value of the several importations mentioned in the agreed state-

ment of facts, the franc should have been estimated at $18\frac{6}{10}$ cents."

Judgment was accordingly entered for the plaintiffs, and from that judgment the case was now brought by the government here.

*Mr. G. H. Williams, Attorney-General, and Mr. C. H. Hill, for the United States; Messrs. W. M. Evarts and Sidney Webster, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

The court below decided that the case was to be governed by the act of 1846, and that the act of 1873 did not cover or embrace it.   The correctness of this decision is now before us for review.

Of course the act last in date must prevail if it covers the case.   Its language is, therefore, to be carefully examined. The important words of the first section are as follows:

" The value of foreign coin, as expressed in the money of account of the United States, shall be that of the pure metal of such coin of standard value."

The plain meaning of this language is, that the value of foreign coins, in United States money, shall be measured by the amount of pure metal contained therein when of standard value; that is, when of the weight and fineness required by the laws and regulations of the country where they are produced.   This value having been duly ascertained and published by the superintendent of the mint and the Secretary of the Treasury, becomes the rule in the cases and for the purposes to which, according to the fair meaning of the act, it is to be applied.   In what cases and to what purposes it is to be applied is not expressed by the statute, but is to be gathered from its general terms, from the context, and from an examination of other statutes passed *in pari materiâ*.   The government contends that it is to be applied in all cases where the estimation of the value of foreign moneys of account is required by law; and that its principal and perhaps most important purpose is the very one in question, namely,

the estimation of the invoice values of imported goods chargeable with ad valorem duties.

This would seem to be, *primâ facie*, the correct construction of the act. The second section proceeds, at once, without any inquiry of the Director of the Mint, or any further investigation of the subject, to adopt this very method of computing the value of the sovereign or pound sterling, the most important foreign coin with which the financial operations of this country are concerned, and to direct that such computation shall be applied to the valuation of invoices of imported goods, and to other specified cases in which the value of the pound sterling is necessary to be ascertained. The value of the sovereign or pound sterling, fixed by this section is four dollars, eighty-six cents, six and a half mills. This is precisely its standard value computed in reference to the amount of pure metal contained in it when of standard value according to the mint regulations of England, and estimating that metal according to the amount contained in the United States dollar. Although the sovereign, or pound sterling, as a coin has only existed since the year 1817, the amount of pure gold contained in the pound sterling (estimating the guinea at twenty-one shillings) has been 113.001 grains ever since the year 1717; and as the United States dollar contains 23.22 grains of pure metal, it only requires a process of simple division to show that the value of the sovereign is precisely what the second section of the act determines it to be. This intrinsic value of the pound sterling, as represented by the gold coins of England, was a matter of such public notoriety as to need no extraneous inquiry on the subject. It was the public law of the British empire during the period of our own colonial history, of which all our courts were required to take judicial notice; and its continuance to the present time is a public fact as well established as any other act of the British government. In addition to this, the Finance Committee of the Senate, in reporting the act of 1873, stated the value of the pound sterling, computed in the manner referred to, as an ascertained fact. There were also other reasons, if any were needed,

having respect to the fictitious par of exchange so long persisted in by the bankers of both countries, which made it expedient for Congress itself to fix the value of the pound sterling. But the material fact in this inquiry is, that it fixed that value on precisely the same principle which it is claimed by the government is laid down in the first section for ascertaining the value of all other foreign coins, and specified the purposes to which such valuation should be applied, amongst which is that of computing the value of invoices of imported goods. And it seems to us clear that the two sections have, in this regard, substantially the same objects in view; that it was the object of the first section to establish a method of computing the value of other foreign coins, similar to that employed in the second section in computing the value of the sovereign, and to apply such computation in the same cases and for the same purposes. Otherwise there would exist two differing methods of computing the values of foreign coins, and two differing rules for estimating the values of goods imported from different countries, giving a different value to goods imported from one country from that given to goods of. the same cost imported from another country.

And it seems to us (although that is a matter of legislative cognizance) that the statute adopts the true method of computing the value of foreign money. The basis of our dollar of account (when not affected by the exceptional condition of legal-tender notes) is the standard gold dollar of 25.8 grains, containing one-tenth alloy. The actual coinage in circulation may be slightly diminished in value by abrasion, and this may have some effect on the dollar of account. But the same thing is true in other countries as the assays at the mint have shown; and the true method of comparing their money of account with ours, when both are based on actual coin, is to compare the standard coins of the two countries in a perfect state, and to ascertain the actual amount of pure metal in each. This is the result at which Congress seems to have arrived, and, as we think, wisely.

In making the comparison of the moneys of different

countries their gold coins, if they have such, are employed for the purpose; gold having become the general medium of international exchange, whilst silver is regarded more as a domestic coin, and is usually made a legal tender for only limited amounts. This practice, together with the rejection of the alloy from the estimate, is in accordance with the rules laid down on the subject by the most enlightened economists.

Computed in the manner required by the law, the value of the franc is ascertained to be nineteen cents and three mills, as contended for by the government. This is the result of the examination and estimate made by the Director of the Mint and announced by the Secretary of the Treasury.

But the defendants in error insist that an examination of prior statutes on the subject of coins and their valuation, demonstrates that the act of 1873 was not intended to fix the value of the franc or of other foreign coins for the purpose of ascertaining the amount of invoices of imported goods, but for the purpose of giving general information on the subject, or of estimating the value of contracts in legal proceedings, or for some other purpose.

We have carefully examined the statutes for the purpose of ascertaining the soundness of this suggestion, but have failed to see anything in the legislation on the subject requiring us to adopt it. It is true that some of the laws have had for object simply the valuation of foreign coins for the use of the custom-house in computing the amount of invoices; others have fixed the value of such coins when receivable in payment of public dues, or when used as legal tenders in the payment of debts; and others have had still other purposes and objects. But how this general fact can affect the express mandatory terms of the act of 1873, we fail to perceive. Those terms are that the value of foreign coin, as expressed in the money of account of the United States, *shall be* that of the pure metal of such coin of standard value. This simple and sensible rule abrogates previous regulations on the subject. It is inconsistent with them, and the third section of the act expressly repeals all acts and

parts of acts inconsistent with its provisions.   No resort to a repeal by implication is necessary.

Of course the act of 1873 does not make foreign coins receivable in cases where they were not receivable before; but where they are receivable, or where their value is material to be known, the rule for ascertaining that value is clearly laid down and determined by the law.   It is true it does not itself fix the values of foreign coins except in a single instance where special reasons require it; and it is doubtful whether the attempt to do so would have been as judicious as the method adopted.   Those values are now to be carefully ascertained and publicly announced by the proper officers of the government.   This method will insure the greatest accuracy, and will be attended with many public benefits.   It is just, both to the government and the importer, because it is founded on truth; and it will be a great convenience to all persons who have any transactions in which the value of foreign money is in any way involved.

JUDGMENT REVERSED, and the record remitted, with directions to the Circuit Court to award

A VENIRE DE NOVO.