## BARR *v.* UNITED STATES.

No. 287.   Argued December 15, 1944.—Decided February 5, 1945.

*Mr. J. Bradley Colburn,* with whom *Messrs. Albert MacC. Barnes* and *Samuel M. Richardson* were on the brief, for petitioner.

*Mr. Ralph F. Fuchs,* with whom *Solicitor General Fahy, Assistant Attorney General Rao* and *Mr. John R. Benney* were on the brief, for the United States.

*Mr. Walter S. Logan* filed a brief on behalf of the Federal Reserve Bank of New York, as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question in this case is the proper rate at which the currency of the invoice of imported goods should be converted into United States dollars under § 522 (c) of the Tariff Act of 1930. 46 Stat. 739, 31 U. S. C. § 372 (c).

On May 13, 1940, petitioner imported into the United States at the port of New York certain woolen fabrics which had been exported from England on May 3, 1940. Payment for the merchandise was made with pounds sterling purchased through the Guaranty Trust Co. of New York in the New York market for cable transfer. The Collector of Customs converted the pounds sterling of the invoice into dollars at the "official" rate of exchange of $4.035. Petitioner claimed that the currency of his invoice should have been converted at the "free" rate of exchange of $3.475138. He paid the higher rate and filed his protest against the Collector's action under § 514

of the Tariff Act of 1930. The Customs Court sustained the protest. 79 Treas. Dec., No. 7, 14. The Court of Customs and Patent Appeals reversed. 143 F. 2d 132. The case is here on a petition for a writ of certiorari which we granted because of the importance of the questions presented.

The "free" rate and the "official" rate have the following origin.

Sec. 522 (a) of the Tariff Act provides that the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value, and that it shall be estimated quarterly by the Director of the Mint and proclaimed by the Secretary of the Treasury. The value of the pound sterling at all times relevant here was proclaimed to be $8.2397. Sec. 522 (b) provides that, for the purpose of assessment and collection of duties upon merchandise imported into the United States, foreign currency shall be converted, wherever necessary, into currency of the United States at the values proclaimed by the Secretary under § 522 (a) for the quarter in which the merchandise was exported. Sec. 522 (b) provides, however, for an exception. That exception is contained in § 522 (c) which reads as follows:

"If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who

shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange."

At all times prior to March 25, 1940, the Federal Reserve Bank of New York pursuant to its authority under § 522 (c) certified daily to the Secretary of the Treasury one buying rate for the pound sterling. When the present war between Great Britain and Germany was declared, the British Government inaugurated a detailed system for controlling foreign exchange. It required among other things that all persons resident in the United Kingdom sell to the British Treasury at prices fixed by it all foreign currency which they were entitled to sell, and prohibited, with certain exceptions, exportation of foreign currency from the United Kingdom and the purchase and sale of foreign currency in the United Kingdom from or to any person other than an authorized dealer and at prices fixed by the British Treasury. On March 7, 1940, an Order in Council, effective March 25, 1940, was issued by the British Government which provided that certain classes of merchandise [1] (whiskey, furs, tin, rubber and jute) might not be exported from the United Kingdom to the United States and certain other countries except when payment had been or would be made to persons resident in the United Kingdom in specified currencies. These currencies included United States dollars or English pounds pur-

---

[1] Subsequent to the exportation of the merchandise involved in the present case this Order was amended, effective June 10, 1940, to include goods of any class or description.

chased in the United Kingdom after September 3, 1939, from an authorized dealer in foreign currency. Authorized dealers sold English pounds only at the rate of $4.035, prescribed by the British Treasury, from January 8, 1940, to September 30, 1942, when the present case was tried.

On March 19, 1940, the Federal Reserve Bank of New York notified the Secretary that because of the order of the British Government of March 7, 1940, it would certify, beginning March 25, 1940, two rates for the pound sterling—one to be designated as the "free" rate, the other as the "official" rate. The latter was the rate fixed by the British Treasury. On April 15, 1940, the Secretary of the Treasury notified the collectors of customs that until further notice he would publish only the "official" rate; and he directed them to use that rate for assessing and collecting duties on imported merchandise whenever it varied by more than 5 per cent from the value of the pound proclaimed by the Secretary under § 522 (a) of the Act.[2] T. D. 50134, 75 Treas. Dec. 370, 371, 5 Fed. Reg. 1447.

On the date petitioner exported his merchandise from England, the Federal Reserve Bank of New York certified to the Secretary of the Treasury that at noon on that day the "free" rate for the English pound was $3.475138 and the "official" rate was $4.035. The Secretary, in accordance with his notification of April 15, 1940, to the collectors of customs published only the "official" rate. T. D. 50146, 75 Treas. Dec. 388. Since the "official" rate varied by more than 5 per cent from the proclaimed value of the pound for that quarter, the collector used the "official" rate in converting pounds into dollars for the purpose of assessing and collecting duties upon the value of the

---

[2] As we have noted, the value of the pound sterling at all times pertinent to this case was proclaimed to be $8.2397.

woolen fabrics. The pounds sterling which petitioner used in the purchase of the woolens were not obtained from an authorized dealer as defined in the British order of March 7, 1940, but, as we have noted, through the Guaranty Trust Co. of New York in the New York market for cable transfer. Petitioner claims that the invoice currency should have been converted at the "free" rate of $3.475138 as determined and certified by the Federal Reserve Bank of New York for the date of this exportation.

It was noted in *United States* v. *Whitridge,* 197 U. S. 135, 142, that the assessment of an *ad valorem* tax on imports involved an ascertainment of the true value of the article taxed as of the date of the tax and that the invoice price was an approximate measurement of that value. As pointed out in that case, the history of the statutes shows a closer approximation to that value as the legislation has evolved. And the enactments made subsequent to the decision in the *Whitridge* case are consistent with that trend. In the beginning Congress prescribed specific dollar values of specified coins. Act of July 31, 1789, § 18, 1 Stat. 29, 41. Not long after, the President was given authority to prescribe regulations for computing duties on imports where the original cost was exhibited in a depreciated currency of a foreign government. Act of March 2, 1799, § 61, 1 Stat. 627, 673. In 1873 Congress provided for an annual estimate by the Director of the Mint of the full metal value of standard coins of the various nations and a proclamation of the value by the Secretary of the Treasury. Act of March 3, 1873, 17 Stat. 602. That estimate was required to be made quarterly rather than annually by the Act of October 1, 1890, § 52, 26 Stat. 567, 624. Then came the Act of August 27, 1894, § 25, 28 Stat. 509, 552, which retained the provision for the estimate and proclamation of metallic values and gave the Secretary of the Treasury power to order a reliquidation at a different value on a showing that the value of the

invoice currency in United States currency was 10 per cent more or less than the proclaimed value. *United States* v. *Whitridge, supra.* The procedure under the latter provision depended on a consular certificate to establish the percentage of depreciation of the currency. T. D. No. 23725, 5 Treas. Dec. 396. There was thus no single source (and none at all in the United States) to which customs officials could look to determine the extent to which foreign currency had depreciated. Moreover, violent fluctuations in foreign exchange rates had occurred after the first World War. It was for those reasons that § 403 (c) was added to the Emergency Tariff Act of 1921, 42 Stat. 9, 17. See S. Rep. No. 16, 67th Cong., 1st Sess., p. 16; H. Rep. No. 79, 67th Cong., 1st Sess., p. 12; *Fry & Friedsam* v. *United States,* 12 Cust. App. 486, 489. And § 403 (c) of the 1921 Act now appears as § 522 (c) of the 1930 Act on whose meaning the present decision turns.

This history makes clear the search which has been made for a measure of the true dollar values of imported merchandise for customs purposes which was accurate (see *Cramer* v. *Arthur,* 102 U. S. 612, 617) and at the same time administratively feasible and efficient. The formula finally selected is dependent on the actual value of the foreign currency in our own money. The rate for the foreign exchange with which the imported goods are purchased is recognized as the measure of value of the foreign currency; the use of that rate reflects values in United States currency which are deemed sufficiently accurate to serve as the measure of the valuation of the goods for purposes of the *ad valorem* tax. As noted in *United States* v. *Whitridge, supra,* p. 144, the actual "unit of cost" conforms with the truth and the meaning of the invoice.

We would depart from that scheme if we read § 522 (c) as saying that on a given date only one buying rate for a specified foreign currency could be certified by the Fed-

eral Reserve Bank of New York or proclaimed by the Secretary of the Treasury. Dual or multiple exchange rates have resulted in recent years from measures for the control and restriction of foreign exchange and export transactions.[3] In the present case the British Government fixed the "official" rate for the purchase of specified commodities for export. One who purchased woolens for export need not acquire pounds at that rate. A lower rate was available and was indeed taken advantage of by petitioner when he purchased pounds to pay for the woolens. If the higher "official" rate is used in the valuation of the woolens, the cost of the goods will be distorted and an inflated value for customs purposes will be placed upon them. Such a result would be quite out of harmony with the history of these statutes and should be avoided unless the result is plainly required by the language of § 522 (c). We do not think it is.

We may assume that the dual or multiple exchange rates which have emerged were not in contemplation when the 1930 Act was passed. As we have noted, they are parts of rather recent measures for the control and restriction of foreign exchange and export transactions. But if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators. *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 257; *Browder* v. *United States*, 312 U. S. 335, 339, and cases cited. Sec. 522 (c) contains no language indicating that the Secretary of the Treasury has any function to perform except the publication of any buying

---

[3] See United States Tariff Commission, Regulation of Tariffs in Foreign Countries by Administrative Action (1934); Twenty-second Annual Report of the United States Tariff Commission (1938) p. 1; Southard, Foreign Exchange Practice and Policy (1940) pp. 185 *et seq.*

rate which is certified. The determination of the rate is left exclusively to the Federal Reserve Bank of New York. It alone is given discretion in computing it. The duty of the Secretary to publish the certified rate is as clear as the duty of the Federal Reserve Bank of New York to determine and certify it. It is true that § 522 (c) speaks only of the "buying rate." And that use of the singular rather than the plural is stressed by respondent. We may note, however, in passing that § 1 of the Revised Statutes, 1 U. S. C. § 1, provides that "words importing the singular number may extend and be applied to several persons or things." Beyond that is the fact that we are construing a provision of a tariff act designed, as we have said, to value imports for customs purposes by means of the buying rate of the invoice currency. The use of the singular is not inappropriate since there is a buying rate for the foreign exchange used to purchase each separate import. We assume that the "official" rate was the all-inclusive rate and could have been used in payment of exported goods of all kinds. But § 522 (c) means to us that that buying rate is to be used which is in fact applicable to the particular transaction. To look to other transactions for the buying rate is to make a valuation of a wholly hypothetical import, not a valuation of the actual one before the collector of customs. Congress could, of course, choose any standard of valuation, for the purposes of the assessment and collection of duties. But Congress in this situation endeavored to provide a flexible and realistic, not an arbitrary, standard. We can indeed see no difference in principle between the use of one of several rates for the currency of a single country and the use of one of several rates each of which is for the currency of a different country. In each different rates are used to ascertain the value of specific imports. The language of § 522 (c) read against the background of these statutes indicates to us that Congress undertook to provide in each case the rate which

gives the closest approximation to the value in dollars of the imported merchandise. That purpose would be thwarted if in the circumstances of this case only one buying rate could be used in making the valuation of the goods. The application of the "official" rate to this particular transaction would assume that petitioner imported whiskey, furs, tin, rubber, or jute rather than woolens. The valuation of the woolens would be inflated and a higher duty would be paid than a fair reading of § 522 (c) necessitates.

It is said that this result runs counter to the provisions of § 402 of the Act which require that the value of imported merchandise shall be the "foreign value or the export value, whichever is higher." But it is not apparent how that policy need in any way be defeated or impaired by the use of the "free" rate of exchange where it is in fact applicable.

Reliance for the other conclusion is also placed on the general authority given the Secretary over the collection of duties on imports [4] and over collectors of customs.[5] It is also pointed out that § 624 of the Tariff Act of 1930 provides that "In addition to the specific powers conferred by this Act, the Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this Act." [6] But these

---

[4] "The Secretary of the Treasury shall direct the superintendence of the collection of the duties on imports as he shall judge best." Rev. Stat. § 249, 19 U. S. C. § 3. And see Rev. Stat. § 248, 5 U. S. C. § 242.

[5] "The Secretary of the Treasury shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue from imports, or to duties on imports, or to warehousing, and shall give such directions to collectors and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law." Rev. Stat. § 251, 19 U. S. C., Supp. III, § 66. And see Rev. Stat. § 161, 5 U. S. C. § 22.

[6] Sec. 502 (c) of the Act provides that "It shall be the duty of all officers of the customs to execute and carry into effect all instructions

provisions merely implement authority which is granted the Secretary and make clear the existence of authority which otherwise might be only implied. They may not be used to detract from the express authority given the Federal Reserve Bank of New York under § 522 (c). But this result is criticized on the ground that it interferes with the control of foreign exchange, which fiscal function has been entrusted to the Secretary, not to the Federal Reserve Bank of New York. It hardly need be pointed out in reply, however, that our decision, like § 522 (c), is concerned only with the assessment and collection of duties upon imports through the use of a formula which Congress designed. If the use of that formula under the changed conditions of these war years is disadvantageous or undesirable, Congress, of course, can change it. But we cannot assume that Congress did not mean what it said when it selected the Federal Reserve Bank of New York rather than the Secretary to perform a restricted function on this single phase of the complicated foreign exchange problem.

Nor is there substance in the argument that the Secretary's action in publishing only one of the rates certified by the Bank is non-reviewable. Sec. 522 (c) plainly gives discretion to the Bank to determine the buying rate. And for the reasons stated we cannot say that only one buying rate must be determined and certified.[7] The exercise of

---

of the Secretary of the Treasury relative to the execution of the revenue laws; and in case any difficulty arises as to the true construction or meaning of any part of the revenue laws, the decision of the Secretary shall be binding upon all officers of the customs."

[7] The case is therefore different from *Collector* v. *Richards*, 23 Wall. 246. In that case the Director of the Mint certified two values of the franc—one under the provisions of the Act of March 3, 1873, 17 Stat. 602, the other under the Act of May 22, 1846, 9 Stat. 14. The Director of the Mint was uncertain whether the latter act had been repealed by the former. The Secretary proclaimed the rate estimated by the Director under the 1873 Act. This Court sustained a collection

the Bank's discretionary power under § 522 (c) is in the category of administrative or executive action which this Court held non-reviewable in *Cramer* v. *Arthur, supra,* and in *Hadden* v. *Merritt,* 115 U. S. 25, 27–28. And see *United States* v. *Bush & Co.,* 310 U. S. 371, 380. But the function of the Secretary in this regard is purely ministerial and is to be contrasted to other situations in which the Secretary is exercising discretionary authority. Cf. *Boske* v. *Comingore,* 177 U. S. 459. The power to publish the certified rate may not be exercised in such a way as to defeat the method of assessment which Congress has provided. Cf. *Campbell* v. *United States,* 107 U. S. 407. Congress has granted judicial review of the decisions of the collector including the legality of the orders and findings entering into the protested decision. §§ 514–517. If the decision of the collector contravenes the statutory scheme and disregards rights which Congress has bestowed, the fact that he acts pursuant to the directions of the Secretary does not save his decision from review. *Campbell* v. *United States, supra.* We think that the use of the "official" rate of exchange in assessing and collecting duties upon these imports transcended the authority of the collector and of the Secretary and that the "free" rate of exchange certified by the Federal Reserve Bank of New York should have been used.

It is finally said that if more than one buying rate may be made applicable to imports from one country,[8] confu-

---

of duties on that basis, holding that the provisions of the 1873 Act controlled. Thus the decision was that only one value of the franc controlled, not that the power of the Secretary to proclaim the value included the power to choose between two available ones.

[8] It should be noted that where two or more currencies of different character circulate in a foreign country the Treasury has provided for the use of the foreign exchange rate for each, the rate used being the rate for the currency in which the same or similar merchandise is usually bought and sold in the ordinary course of trade. See Customs Regulations of 1937, Art. 776 (a) and (e), as amended by Treas. Dec. 50251 (i) and (j), October 10, 1940.

sion and complexity in administration of the Tariff Act will result. But that showing would have to be far more clear and the meaning of the Act much more dubious for us to give those administrative considerations weight in the interpretative process.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

As part of the effective financial conduct of the war, the United Kingdom brought sterling under control by fixing its exchange value. A limited supply of sterling in foreign countries presented a special problem. But though that supply was out of its bounds, Great Britain by various mechanisms could bring it under control. Apparently it moved to do so as quickly as economic and political considerations permitted. See the statement of the Chancellor of the Exchequer on April 9, 1940, in reply to various questions in the House of Commons, 359 H. C. Deb. (5th ser. 1940) 461–463. Thus, while "the vast bulk of transactions between sterling and other currencies" was conducted at the exchange rate fixed by the Government, the supply and demand of sterling abroad created a market. By virtue of various British restrictions this free sterling market became increasingly thin. See 26 Fed. Res. Bull. (July, 1940) 638; The Commercial and Financial Chronicle, April 20, 1940, Vol. 150, Pt. 2, pp. 2478–79. Nevertheless, until the British Government completely clamped down on the use of this free sterling in payment of exports, it was possible to pay for such exports in sterling purchased at a lower rate than that which the British Government believed to be a reflection of the true value of the pound and officially fixed as such.

Plainly enough, a single currency having multiple values has important bearings upon the flow of goods and

upon international economic relations. In the case of Great Britain, the situation may have not been serious because, as we noted, free sterling played a relatively small share in the economic interchange between the two countries. The "free" rate was employed only in limited transactions and evidently represented on the part of Great Britain merely a transitory compromise with circumstances. In short, the official rate was not an unreality. But in the case of some countries, a dual system of rates of exchange may have decisive economic effects through highly organized manipulation of exchange, with all the evils that result from confusion and from depreciated currencies.

To dispose of the case on the assumption that it merely involves enforcement of a Congressional policy for assuring approximate accuracy in determining the true dollar value of a particular importation is to throw the significance of the case out of focus. The problem, as I see it, is whether Congress by § 522 (c) of the Tariff Act of 1930, 46 Stat. 590, 739, 31 U. S. C. § 372 (c), prohibited the Secretary of the Treasury from safeguarding the public interest as he did, in relation to dislocations in the money markets following the outbreak of the war and to their repercussions both upon our domestic economy and our international relations. That the Treasury's instruction to the collectors of customs to assess tariff duties on the basis of the sterling rate fixed by the British Government was not an ordinary Treasury order affecting the collection of revenue is attested by the fact that the instruction was the result of a conference of the Secretary of State, the Secretary of the Treasury, the Attorney General and the Secretary of Agriculture. See New York Times, April 17, 1940, p. 4, col. 5; The Commercial and Financial Chronicle, April 20, 1940, Vol. 150, Pt. 2, pp. 2478–79.

It is not suggested that apart from § 522 (c) this Government could not protect its interests in relation to the

abnormal currency situations precipitated by the war through such action as the Secretary of the Treasury here took. The wide duties of financial supervision possessed by the Secretary by virtue of his office and the broad powers implied in various provisions of law, see for instance: 5 U. S. C. § 242, 19 U. S. C. § 3; § 624 of the Tariff Act of 1930, 46 Stat. 590, 759, 19 U. S. C. § 1624, and *Boske* v. *Comingore,* 177 U. S. 459, would give him ample warrant to fix a rate for dollar conversions of foreign currencies on a uniform basis reflecting the dominant value among multiple values of a foreign currency and one not subject to manipulations or influences adverse to our interests.

Withdrawal of this power of the Secretary of the Treasury implies a radical curtailment of his historic and appropriate authority to protect the nation's fiscal interests. If it chose, of course Congress could so curtail the Secretary's powers. But such an important change in the executive responsibility for our fiscal affairs ought to be disclosed through some unequivocal Congressional expression. To find such destructive force in § 522 (c) is to attribute to it a potency not designed by Congress. It is conceded that in the legislation which is now § 522 (c) Congress was concerned solely with fluctuations in a single exchange rate, a problem thrown up after the First World War. And so Congress designated the Federal Reserve Bank as a fact-finding agency to ascertain the most durable among fluctuating quotations. But multiple rates for a single currency—with their effects upon the flow of goods and upon international economic relations and the opportunities they afford for highly organized manipulations of exchange—present a totally different problem. That problem, as is admitted by the Federal Reserve Bank appearing before us as *amicus curiae,* was not at all in the contemplation of Congress. That problem was not dealt with by Congress because it did not con-

front Congress. As a problem it did not emerge until, in 1940, the present war confronted the Federal Reserve Bank and the Secretary of the Treasury with it.

The Federal Reserve Bank and the Secretary of the Treasury, having different functions, naturally dealt with it differently. Although, to be sure, § 522 (c) charged the Federal Reserve Bank with the ascertainment of a single exchange rate, the Bank naturally enough solved the dilemma which confronted it when there were two rates for sterling by reporting both, although the significance of the two rates and the range of their functions varied greatly. It was not for the Bank to pick only one rate, for the Bank is merely a reporting agency and not a policy-making agency. But the determination whether one of the two rates is *the* rate, and if so which should have that fiscal function, is a policy problem, and the Secretary of the Treasury is the agency vested with responsibility for fiscal policies.

For the selection by the Secretary of the Treasury of an exchange rate in a situation like the one before us has implications far beyond translating into dollars the value at which a particular importer actually settled for the foreign price of his goods. The selection of the governing rate of exchange in the case of multiple rates affects at least three very important phases of our international economic relations. By § 402 of the Tariff Act of 1930, 46 Stat. 590, 708, 19 U. S. C. § 1402, in the assessment of *ad valorem* duties it is necessary to ascertain the foreign market value, which normally means the foreign home value. Commodities subject to the "official" rate and commodities available through "free" sterling may well have an identical home value and yet, according to the contention of the importer, one valuation would have to be reached according to § 522 (c) and another according to § 402. Again, the Secretary of the Treasury may impose countervailing duties whenever he finds that imported

goods enjoy a bounty, direct or indirect. Section 303 of the Tariff Act of 1930, 46 Stat. 590, 687, 19 U. S. C. § 1303. Such bounties may readily take the form of favorable exchange rates. An unwarrantably rigid denial to the Secretary of the determination of an exchange rate which in substance corresponds to the realities of international exchange may force him to exercise the penalizing power of imposing countervailing duties. Finally, foreign exchange rates affect the fruitful use of foreign trade agreements. Section 350 of the Tariff Act of 1930 as amended by 48 Stat. 943, 19 U. S. C. § 1351 *et seq.*

All these dangerous potentialities would of course be irrelevant if Congress had dealt with the problem of multiple rates in a rigid way and put the responsibility upon the Federal Reserve Bank to select one of such multiple rates. But the hand of the Government ought not to be tied too closely where, to put it mildly, the Congressional purpose has been ambiguously expressed. We cannot find such purpose from a reading of what Congress has written. We are hardly justified in assuming that if Congress had addressed itself to this problem it would have tied the hands of the Secretary of the Treasury and brought into play all the difficulties that have been indicated in the ascertainment of foreign home value, in the imposition of countervailing duties, and in embarrassing the policy of trade agreements. The power of Congress to pass new legislation is hardly a reason for giving old legislation a construction that disregards its history and its context and the unhappy consequences of such disregard.

Of course, general condemnation of a practice covers any specific manifestation of it, even though the latter was "unforeseen" by Congress, *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, just as a general outlawry of the use of a false document hits also a use to which the document was not "ordinarily" put when the legislation was passed. *Brow-*

*der* v. *United States,* 312 U. S. 335. But these are instances of proper statutory construction quite irrelevant to the present case. It is one thing for judges not to excise a particular situation from language appropriately describing a general problem. Judicial interpolation into a statute of a wholly unrelated problem not envisaged by Congress is quite another matter. In this case we have not an unforeseen situation fitting into a general context. Here we have an unforeseen problem with which Congress did not deal and yet, by not dealing with it, is said to have taken away authority theretofore belonging to the Secretary of the Treasury. If the problem itself was not in the contemplation of Congress, as this problem was not, how can it be said that Congress legislated concerning that problem?

The judgment should be affirmed.

MR. JUSTICE BLACK joins in this dissent.