35 C.C.P.A.(Customs)

## BARR v. UNITED STATES.

Customs Appeal No. 4553.

Court of Customs and Patent Appeals.

April 22, 1947.

Barnes, Richardson & Colburn, of New York City (J. Bradley Colburn, of New York City, of counsel), for appellant.

Paul P. Rao, Asst. Atty. Gen. (Joseph F. Donohue and Michael Stramiello, Jr., Sp. Attys., both of New York City, of counsel), for the U. S.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

JACKSON, Associate Judge.

The sole issue in this appeal from a judgment of the United States Customs

Court, Third Division, C.D. 1013, is whether, in the conversion of English pounds to American dollars, the collector improperly used the "official" buying rate of the pounds rather than the "free" buying rate, as claimed by appellant.

The provisions of the Tariff Act of 1930 relating to the conversion of foreign currency are as follows:

"Sec. 522. Conversion of Currency.

"(a) Value of Foreign Coin Proclaimed by Secretary of Treasury.—Section 25 of the Act of August 27, 1894, entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes,' as amended, is reenacted without change as follows:

"Sec. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year.

"(b) Proclaimed Value Basis of Conversion.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

"(c) Market Rate When no Proclamation.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal Reserve Bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange." 31 U.S.C.A. § 372.

It appears that on July 3, 1940, appellant imported certain woolen goods from England, which were classified by the Collector of Customs at the port of New York as woven fabrics under paragraph 1101(a) of said act, 19 U.S.C.A. § 1001, par. 1101(a). The correctness of the classification was not challenged. The goods were exported on June 17, 1940. The duly proclaimed value of the pound sterling for the quarter within which the merchandise was exported was $8.2397. Such proclamation was made by the Secretary of the Treasury on the estimation by the Director of the Mint pursuant to section 522, supra, T.D. 50125, 75 Treas.Dec. 356. On the date of exportation, in accordance with subparagraph (c) of that section, the Federal Reserve Bank of New York certified to the Secretary of the Treasury two buying rates in the New York market for pounds sterling—the "official" rate of $4.035 and the "free" rate of $3.665. It is obvious that both buying rates varied from the proclaimed value by more than 5 per centum.

The "official" rate is the value of the pound sterling as fixed by the British Treasury for export purposes and the "free" rate is the rate at which it can be bought in the exchange markets of the world at prevailing prices.

It is agreed by the parties that "official" and "free" rates of exchange, applicable on the date of exportation of the involved

goods, were duly published by the Secretary of the Treasury.

The record discloses that the imported merchandise was purchased and paid for in pounds sterling obtained in the New York market for cable transfer at the "free" rate of exchange in effect on the date of their purchase and the record in the case of Barr v. United States, 324 U.S. 83, 65 S. Ct. 522, 89 L.Ed. 765, was received in evidence. The decision in that case, two justices dissenting, reversed the decision of this court, United States v. Barr, 143 F.2d 132, 32 C.C.P.A., Customs, 16, C.A.D. 279, which reversed the judgment of the United States Customs Court, C.D. 801, sustaining the protest of appellant.

In that case, as here, the merchandise consisted of woolen goods exported from Great Britain; the proclaimed value of the pound as estimated by the Director of the Mint was the same as in the instant case; the Federal Reserve Bank of New York had certified an "official" buying rate of $4.035 and a "free" buying rate of $3.475138 in the New York market for pounds sterling on the date of exportation; and the merchandise was purchased and paid for in pounds sterling acquired at said "free" rate. The Secretary of the Treasury had instructed collectors to use the "official" rate in converting pounds sterling into American currency and published that rate only. The trial court held such action by the Secretary was unwarranted and that it was the duty of the collector to have used the "free" rate certified by the Federal Reserve Bank on the date of exportation—May 3, 1940.

On appeal here we held that, in our opinion, since the instruction by the Secretary of the Treasury showed on its face that it conformed to section 522(c) in that he published it to the extent he deemed necessary, it was conclusive, binding and not subject to judicial inquiry as to its correctness and, therefore, it was the statutory duty of the collector to carry such instruction into effect. The decision of the Supreme Court, reversing that of this court, held that the publishing by the Secretary of the Treasury of buying rates determined by the Federal Reserve Bank was purely administrative

and that since the woolens could be freely purchased on the date of exportation at the "free" rate, that that rate was the proper measure of the dollar value of the pounds of the invoice for dutiable purposes.

It appears in the record of the incorporated case that on March 7, 1940, the British Government issued an Order in Council, effective March 25, 1940, providing, among other things, that whiskey, furs, tin, rubber and jute could not be exported from the United Kingdom to certain countries, among which was the United States, unless payment therefor would be made in specified currencies, including United States dollars and English pounds purchased from authorized agencies of the British Treasury at the "official" rate fixed by it. All other merchandise for export, which included woolens, could be purchased with pounds acquired at the "free" rate.

On June 7, 1940, effective June 10th of that year, the order was amended by a further order under the terms of which all exported goods would have to be paid for in pounds purchased at the "official" rate. The latter order, among other things, contained the following:

(1) Subject to any exemptions which may be granted by order of the Treasury, no person shall, except with permission granted by or on behalf of the Treasury, export goods of any class or description to a destination in any territory to which this Regulation is applied by order of the Treasury, unless it is shown to the satisfaction of the Commissioner of Customs and Excise—

(a) That payment for the goods has been made to a person resident in the United Kingdom in such manner as may be prescribed in relation to the territory in question;

(b) That payment for the goods is to be so made not later than six months, or such longer period as may be allowed by or on behalf of the Treasury, after the date of export; and in either case that the amount of the payment of the goods represents the full value of the goods subject to such deductions, if any, as may be allowed by or on behalf of the Treasury.

As evidence of an exemption there was received in evidence a document entitled

"Notice to Banks and Bankers. Exports, No. 2. Amendments to Regulation 5B." That document contains the following: Permission to ship under a pre-zero contract will be given only in cases where the exchange has already been covered by the purchaser of the goods prior to the 8th June, 1940, in respect of a sales contract made before that date. In cases where a confirmed credit providing for reimbursement in sterling has been opened in favour of the U. K. exporter, a bank in the U. K. may accept this as prima facie evidence that the exchange has been covered. In other cases, unless the bank in the U. K. has been informed that exchange in respect of a particular transaction was covered prior to the 8th June, 1940, it should make the necessary enquiries, by cable if necessary, from its overseas correspondent on its customer's behalf. U. K. banks may accept the statements of their correspondents on this matter; such statements will be subject to verification by the Control later. U. K. banks should in all cases call for written confirmation of their overseas correspondents' statements.

Notes:

1. For the purposes of Regulation 5B as amended a "pre-zero contract" is a contract of sale of goods entered into prior to 8th June, 1940.

2. The authority which is being given to the banks authorized to approve Form E. 1 to grant special permission in respect of "pre-zero contracts" is limited to the granting of permission in respect of shipments taking place not later than 8th September, 1940; any cases arising subsequently should be referred to the Bank of England or one of its Branches.

3. The banks concerned may not grant special permission unless they are satisfied by evidence tendered to them that the sale contract relates to an offer made and accepted prior to 8th June, 1940; all doubtful cases, or cases involving long-term contracts, or "supply arrangements," must be referred to the Bank of England or one of its Branches.

4. The evidence on which banks grant special permission to ship must remain attached to the relative Form C.D. 3; if the evidence is in the form of original documents, copies certified by the bank may be substituted.

The invoice covering the present importation contains the following notation: Order No. 601—Accepted 29/1/40 and Order No. 608—Accepted 30/3/40.

The trial court held that an inference might be drawn from such notation and evidence of payment for the imported merchandise acquired at the "free" rate that the laws and regulations pertaining to the exemption heretofore noted had been complied with; that from such inference a presumption arose that the regulations of the British Government had been followed; and that such presumption had not been refuted. The court, however, pointed out that the facts in the instant case and those of the former Barr case, supra, differ in that the woolens imported in the latter case were not required to be purchased at the "official" rate, whereas on the date of exportation of the instant merchandise all goods exported from the United Kingdom had to be paid for in pounds bought at the "official" rate and that it was necessary to satisfy the British authorities that the exported goods were so paid for excepting, of course, those involving a "pre-zero" contract and paid for in pounds acquired prior to June 8, 1940.

The trial court held that its decision was not inconsistent with the reasoning of the majority opinion of the Supreme Court in the Barr case, supra, stating that it was there held that the use of the "official" rate was improper in converting the pounds of the invoice because such use would not reflect the true value of the merchandise and that the importer was entitled to the benefit of the "free" rate because woolens could be freely purchased with pounds bought at that rate on the date of exportation of the involved merchandise.

The trial court was of opinion, under the facts in this case, that since the British law had been changed it could not be held, as was stated by the Supreme Court [324 U.S. 83, 65 S.Ct. 526], that "The application of the 'official' rate to this particular transaction would assume" that merchandise which were not woolens had been imported and, further, it could not now be said that "The valuation of the woolens would

be inflated and a higher duty would be paid than a fair reading of § 522(c) necessitates." The court stated: "We must not confuse 'value' with 'cost' of the imported merchandise." and in that connection cited section 402 of the Tariff Act, 19 U.S.C.A. § 1402, which defines both foreign and export values, the time of ascertaining such values as the date of exportation and the price as that at which all purchasers could buy.

In our opinion the trial court properly held that as far as the facts here are concerned there is nothing in its decision in the former Barr case, supra, nor in the majority opinion of the Supreme Court which would authorize the use of the "free" rate of exchange in converting the invoice currency of the involved goods to American dollars.

Appellant contends that the decision of the Supreme Court was misconstrued and misapplied by the trial court and when properly construed, under the facts of this case, the use of the "free" rate is proper in converting the currency of the invoice. He further contends that section 522(c) in establishing the formula therein set out may not be properly controlled by the definitions of value in section 402. Appellant argues that the decision of the trial court holding that for the purposes of section 522(c) a rate of exchange must be employed which was available on the date of exportation to all purchasers of woolens, which would be the "official" rate, was erroneous.

Government counsel contends that appellant did not sustain his burden of proof and, although supporting the judgment appealed from, argues vigorously that the evidence is insufficient to establish a presumption as to the existence of a contract between the exporter and importer, or to establish the date when the currency used in the transaction was purchased. It is further contended, on behalf of the government, that the rate of conversion of pounds to United States currency bears a relation to the true value of the merchandise and that, therefore, the "official" rate must be used.

It will be observed, from what has been said, that the facts in the instant case and the British law pertinent thereto are differ-ent from the facts of the Barr case, supra, and the British law as then existing, and that our decision hinges upon the interpretation of the said decision of the Supreme Court as applied to the facts and the British law in this case.

The majority opinion of the Supreme Court in the Barr case, supra, outlined the history of section 522(c), stressing the efforts that had been made by Congress to arrive at " * * * a measure of the true dollar values of imported merchandise for customs purposes which was accurate (see Cramer v. Arthur, 102 U.S. 612, 617, 26 L. Ed. 259) and at the same time administratively feasible and efficient."

The opinion further held that the policies enunciated in the provisions of section 402 would not be defeated or impaired when the "free" rate of exchange is in fact applicable.

■ In our opinion appellant has not sustained his burden of proving that the transaction between appellant and the exporter was within the exemption of the Order in Council above referred to. His proof merely went to the existence of a "pre-zero" contract but no evidence of any kind was offered proving or tending to prove any of the other conditions heretofore set out under which goods could be exported in accordance with such contract. We must hold, therefore, that appellant may not avail himself of the "pre-zero" exemption.

■ It is to be remembered that in the prior Barr case, supra, woolens for export could be freely purchased in England by anyone and paid for in pounds bought at the "free" rate as it existed on the date of exportation. The woolens there were so purchased and the conversion of the pounds of the invoice to American dollars at that rate was held to be proper. In the instant case no goods could be exported from England subsequent to June 8, 1940, subject to the exception above noted, unless paid for in pounds valued at the "official" rate.

Section 522(b) provides for the assessment and collection of duties upon imported merchandise and the buying rate referred to in section 522(c) is that rate at which foreign currency could be acquired

only for the purchase of goods to be exported to the United States. It is clear to us that, subject to the above stated exceptions, if no goods could be exported from Great Britain to the United States unless paid for in pounds which had been acquired at the "official" rate there could be no other value for British pounds so used except that which is expressed by such rate.

Therefore, the certifying to the Secretary of the Treasury of a "free" rate by the Federal Reserve Bank, under the facts of this case, appears to be immaterial.

For the reasons heretofore stated the judgment of the United States Customs Court is affirmed.

Affirmed.