**ENERGETIC WORSTED CORP.**

**v.**

**UNITED STATES.**

**C.D. 2413.**

United States Customs Court,
Third Division.
Oct. 21, 1963.

Richardson, J., dissented.

William Whynman, New York City (William D. Valente, Philadelphia, Pa., of counsel); Leon I. Mesirov, Associate counsel, Philadelphia, Pa., for plaintiff.

John W. Douglas, Asst. Atty. Gen. (Daniel I. Auster and Murray Sklaroff, New York City, Trial attys.), for defendant.

Before DONLON, RICHARDSON, and WILSON, Judges.

DONLON, Judge.

The merchandise involved in this case consists of combed worsted wool tops of various grades, exported from Uruguay between May 16, 1953, and September 11, 1953, and entered at the port of Philadelphia between June 23, 1953, and October 16, 1953. In addition to the assessment of regular duties, concerning which no question has been raised, countervailing duties were levied pursuant to section 303 of the Tariff Act of 1930 (19 U.S.C. § 1303) and T.D. 53257 at the rate of 18 per centum of the invoice value of the merchandise and any dutiable charges thereon.

The assessment of countervailing duties is protested on several grounds, those relied upon at the trial being: (1) That no bounty or grant was paid or bestowed directly or indirectly upon the manufacture, production, or exportation of the imported merchandise; (2) that the Secretary of the Treasury's determination that a bounty or grant was paid in connection with these wool tops was erroneous, arbitrary, and capricious; (3) that the assessment was in violation of the treaty between the United States and Uruguay, 56 Stat. 1626, T.D. 50786; (4) that the assessment was discriminatory and in violation of section 8, Article 1, of the Constitution of the United States and the fifth amendment thereto; and (5) that the assessment was invalid for failure to follow the procedure prescribed in the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., 60 Stat. 237.

During the course of the trial, various documents were offered in evidence, the admissibility of which was not passed upon by the trial judge but decision was reserved for the division. These documents are the entry papers in their entirety, a chart, prepared by defendant's witness Kenneth W. Marriner, entitled "Effect of Different Export Rates of Exchange on Wool Tops from Uruguay" (defendant's exhibit B for identification), and a publication, issued by the United States Department of Commerce, entitled "licensing and exchange controls * * * Uruguay," prepared by defendant's witness Robert W. Wagner in 1957 (defendant's exhibit D for identification). We are of opinion that the entry papers in their entirety and defendant's exhibit B for identification are admissible in evidence. Accordingly, plaintiff's objections as to such documents are overruled and they are received in evidence.

We are of opinion that defendant's exhibit D for identification is not admissible. Authorship of a technical publication prepared in 1957 and offered as evidence to qualify a witness as an expert in the field covered by the publication is no evidence of the witness' qualification in such field in 1953, the period in issue. Furthermore, since the witness' qualifications have not been attacked and have been otherwise established, the exhibit is superfluous. Accordingly, plaintiff's objections to the document are sustained.

■ The primary issue in this case is whether the multiple exchange rate system in effect in Uruguay at the time of exportation conferred a bounty or grant on wool tops requiring the imposition of a countervailing duty pursuant to section 303 of the Tariff Act of 1930.

It appears from the documentary evidence presented that, on September 25, 1947, the Uruguayan Government promulgated a basic decree providing that the Executive might grant preferential exchange treatment consisting of the establishment of exchange rates varying between 1.519 and 1.78 pesos per dollar "for industries which need it in order to place their products abroad." (Plaintiff's collective exhibit 6.) The decree lists certain considerations which entered into the issuance thereof, such as the world economic situation and its repercussions upon Uruguay, the need to keep potential markets open to Uruguay's incipient industrial production, the prevention of unemployment, and the strengthening of industrial activity. It was noted that the Bank of the Republic concurred in the objectives of the draft decree and found that nothing stood in the way of its application from the standpoint of international agreements, since the Bretton Woods Agreement allowed a 5-year period for unification of exchange rates and Uruguay had not yet fixed the parity of its currency. It was also noted that a communication from the international Monetary Fund established the parities between 151.90 and 190 pesos per $100 and that the exchange rates envisaged by the decree were not inconsistent therewith.

Subsequent to this decree, others were promulgated from time to time assigning different rates of exchange to different commodities, ranging from 1.519 pesos per dollar to 2.35 pesos per dollar. (Plaintiff's collective exhibit 5.) In general, higher rates were established for processed and manufactured articles.

During the period involved in the instant case, the rate of exchange applicable to wool in the grease was 1.519 pesos per dollar and that applicable to certain woolen manufactures was 2.35 pesos per dollar. Exports of combed wool tops were subject to a combined rate of exchange, namely, 76 percent at 2.35 pesos per dollar and 24 percent at 1.519 pesos per dollar. This rate was modified on July 23, 1953, to 65 percent at 2.35 pesos per dollar and 35 percent at 1.519 pesos per dollar. The first-mentioned combined rate was equivalent to an effective rate of 2.15 pesos per dollar and the second to an effective rate of 2.06 pesos per dollar.

According to uncontradicted testimony, the Uruguayan exporter was required to file a sworn declaration of a transaction with the Government exchange control authorities giving in detail the terms and conditions of sale. Unless the authorities considered the exporter was getting a fair market value for the merchandise, the declaration was not accepted. Exporters were required to surrender to the Bank of the Republic all foreign exchange acquired through sales, in return for which they received pesos at the rate of exchange assigned to the commodity involved. Although the decrees do not so state, there is uncontroverted evidence that exporters of wool tops and of wool in the grease were permitted to retain 5 percent of the dollars received to use for whatever purposes desired, including sale at the prevailing free rate of exchange, which averaged around 3 to 1. Neither the controlled pesos nor the free pesos were blocked or restricted, and both had the same value. Exporters of wool in the grease received in addition a tax exoneration of between 5 and 7 centesimos.

One witness Frank Raquet, general manager of Engraw Export & Import Co., the manufacturer (hereinafter called Engraw), testified that there was a free market in Uruguay where one could freely buy or sell foreign exchange without Government control. He was not certain whether or not it was limited to financial transactions exclusive of trade transactions. He said, "there might be something that can be bought at the free rate of exchange."

Mr. Raquet also stated that for export to nondollar areas, the exporter could withhold only 2 percent of the exchange. He explained:

"X Q. Can you tell why there was that differential between the 2 and 5 percent?—A. Sure. Everybody likes the American dollar, including Uruguay. We like to buy everything here when we can.

"X Q. In other words, you would rather make your shipments to the United States, and encourage your trade to the United States?—A. Uruguay definitely would.

"X Q. By Uruguay, you mean yourself, too?—A. Sure. [R. 53.]"

Plaintiff purchased the wool tops involved herein from Engraw in United States currency at varying prices per pound ($0.90, $1, $1.33½, $1.38), payment being made by letter of credit. Plaintiff made no other payment and gave nothing else of value to the manufacturer or to anyone else for the merchandise and received nothing of value therefor other than the merchandise.

Mr. Raquet testified that Engraw received payment for the wool tops in accordance with the terms of purchase but did not obtain physical possession of the dollars, by reason of the Uruguayan laws already referred to. It received a credit of 2.15 pesos per dollar for 95 percent of the foreign exchange and retained 5 percent in dollars which it was free to use as it pleased.

During this period, Engraw sold wool tops in Uruguay and to countries other than the United States at substantially the same price as it sold to plaintiff. Mr. Raquet stated that the price to plaintiff was not influenced in any way by the rate of exchange and that Engraw did not receive directly or indirectly any other payment, concession, or thing of value from Uruguay or any political subdivision thereof in connection with the manufacture, production, or exportation of this merchandise.

According to Mr. Raquet, Engraw began to manufacture wool tops in October 1951 at a cost of 0.90 peso per pound. It exported 150,000 pounds in that year and greater quantities in 1952 and 1953, most of it to plaintiff. However, the witness stated that the firm would not have been able to export wool tops to the United States at the exchange rate of 1.519 pesos per dollar. He testified, but did not explain, "They would have taxed us out of business." He also stated that the differing rates of exchange are part of the internal taxation system of Uruguay.

Kenneth W. Marriner, called as a witness for the defendant, testified that he has been in the wool and top making business since 1923 and is presently operating under the name Marriner & Co., Inc. That firm makes tops here from wool imported from foreign countries or grown in the United States. It also makes tops in foreign countries where the wool exists and imports the product into the United States. During 1953, the firm was the fourth largest producer of wool tops in the United States, but not during 1952, for the following reason. In 1952, according to the witness, the advantage Uruguay gave to wool tops made it impossible for an American manufacturer to compete. Therefore, his firm cut its own production from 10 million to 5 million pounds and purchased the total output of one of the largest Uruguayan plants. In that year, the firm sold approximately 10 million pounds of wool tops, worth 20 million dollars. Of this amount, 5,400,-000 pounds, having a value of $7,200,-000, were imported from Uruguay. During 1953, however, it imported only 2,100,000 pounds, having a value of $2,500,000, and its production in the United States amounted to 8 million pounds. After the countervailing duty went into effect, it did not purchase any wool tops from Uruguay.

Mr. Marriner described the effect of the Uruguayan exchange rate system on wool tops and referred to a chart prepared on the basis of his personal knowledge gained in importing both wool and tops from Uruguay over the past 23 years. According to the testimony and the chart, where wool tops were made in the

United States from Uruguayan wool and the estimated cost of the wool was 1.51 pesos or $1, duty on the wool was 26 cents and the cost of conversion in the United States was 30 cents, making the total cost in the United States $1.56. If the tops were made in Uruguay, the cost would be 1.51 pesos for the wool and 38 pesos for the conversion. Converted at the same rate of exchange applicable to wool, 1.514 pesos to the dollar, the cost would be $1.25 plus the duty on wool tops of 36 cents, making a total cost of $1.61. However, if the pesos were converted at the preferential rate of 2.15 pesos per dollar, the cost would be 88 cents for the wool tops plus 34 cents duty, making a total of $1.22, thus giving an advantage to Uruguay of 34 cents. After the countervailing duty of 22 cents was added, the total cost would be $1.44, still giving Uruquay an advantage of 12 cents over the cost of tops made in the United States from Uruguayan wool. This advantage may have been offset to some extent by the fact that United States-made tops were of better quality.

Robert W. Wagner, who served as a commercial attaché in the American Embassy in Uruguay between 1951 and 1954, testified that he and the members of his staff were continually engaged in reporting on current economic developments in Uruguay respecting licensing and foreign exchange controls, with specific reference to the wool and wool top industries. The information thus supplied, together with the decrees of the Uruguayan Government, were used by the Department of Commerce in preparing reports such as plaintiff's exhibit C, entitled "Business Information Service—World Trade Series, No. 636." Mr. Wagner described in detail the operation of the Uruguayan foreign exchange system in 1953, pointing out that all foreign exchange flowed into and out of the Bank of the Republic, which bought cheap and sold dear. In his opinion, the rate applicable to wool tops enabled the Uruguayan seller to dispose of them at a lower price to the United States purchaser than he could have if he had been compelled to sell at the rate for basic commodities. In other words, the favorable rate gave the manufacturer of wool tops a larger return on his foreign exchange.

According to public record, during 1951 and 1952, American manufacturers presented statements at congressional hearings to the effect that the multiple exchange rate systems in Argentina and Uruguay gave exporters of wool tops the equivalent of a subsidy and requested the Treasury Department to impose a countervailing duty. Hearings before the Committee on Ways and Means, House of Representatives, 82d Congress, 1st session, on H.R. 1535, pages 685–691; Hearings before the Committee on Finance, United States Senate, 82d Congress, 2d session, on H.R. 5505, pages 209–212; 253–270.

In December 1950, the Treasury Department denied that the multiple exchange rate system resulted in a bounty or grant, but in May 1953, the countervailing duty here involved was levied.

Charles R. Harley, chief of the Latin American Division of the Office of International Finance of the Treasury Department, testified at the trial that since becoming chief he had familiarized himself with the records of the Division in connection with the imposition of countervailing duties on wool tops and had conversed with Uruguayan officials in regard thereto. He stated that the Division had examined the Uruguayan exchange system and made computations which were adopted by the Treasury Department in 1953 as a basis for determining the amount of the subsidy, and, accordingly, the amount of the countervailing duty on wool tops. His studies showed that the Division—

"made a very thorough examination of the Uruguayan exchange rate system, the relationship thereto of the rate for wool tops, study of the trends of trade of wool top exports from Uruguay, a study of the effect of the exchange rate given to wool tops upon the price at which Uruguayan wool tops were sold in the United States market. [R. 184.]"

These studies disclosed that exports of wool tops from Uruguay were very small or negligible in 1947 and 1948, and that they began to grow in 1949. In 1950, they were slightly over 1 million pounds; in 1951, 3.7 million pounds; and, in 1952, 17 million pounds.

According to Department of Commerce Report No. FT 110, and the testimony herein, between 1950 and 1953, there was a marked increase in the importation of wool tops into this country and an even greater increase in the percentage imported from Uruguay. That percentage increased from 25 percent in 1950 to 84 percent in 1953.

According to Mr. Harley, studies were also made by the Latin American Division with regard to the competitive position of Uruguayan wool tops in the United States market. These showed that, except for December 1951 and January 1952, Uruguayan wool tops were selling below the cost of United States-produced wool tops in amounts varying from 5 to 67 cents per pound. The average shown by an investigation in 1950 was 30 to 40 cents below the cost of American-made tops. In July and August 1952, such average was 20 cents a pound and, according to a report made to Treasury in September 1952, four Boston firms gave estimates averaging 20 to 25 cents and four other firms gave estimates averaging 7 to 10 cents below the cost of American-made tops.

In explaining the reason for the imposition of countervailing duties on wool tops from Uruguay, David W. Kendall, Assistant Secretary of the Treasury, stated in a letter, dated February 8, 1957 (defendant's collective exhibit 18):

"In the case of Uruguayan wool tops, the granting of more favorable export rates by Uruguayan authorities was followed by very large increases in U.S. imports of this commodity. In the absence of new factors contributing to substantially increased productivity in Uruguay, this increase indicated that the preferential rate for wool tops had, in fact, given an unfair competitive advantages to Uruguayan wool tops entering the markets of the United States."

Mr. Harley described the method by which the amount of countervailing duty was determined as follows:

"[The Uruguayan exchange system] was a multiple exchange system with a basic rate of 1.519, and two other rates on the export side, plus four mixed rates at the time the first study was made. On the import side, three so-called basic rates. We wish to relate the wool tops rate to something in order to form a judgment whether or not this was a bounty under the terms of the law. We thought that the most representative, intelligent thing to do would be to take a weighted average of all the rates used, both on the export and import side; by weighted average I mean we took full account of the total value of exchange that was bought and sold at each rate, and that went into the computation. The resulting weighted average, which we have since called a representative rate, turned out to be 1.86 pesos to the dollar. We compared this 1.86 with the then existing rate on wool tops, and determined that 18 per cent would be an appropriate countervailing duty. [R. 185.]"

This 1.86 figure was the weighted average of the import and export rates prevailing in Uruguay at the relevant time and was suggested as a representative rate against which other rates might be judged. The witness explained that for weighting purposes they had used the most recent exchange rates available at the time the study was made in 1953 and the latest available trade statistics, which were those of 1951. In arriving at the representative rate, consideration was given to the operations in the free market as to merchandise transactions and to the 5 percent retention. No consideration was given to transactions in monetary gold or those involving payment for services or balance of payments other than merchandise transactions.

The Treasury did not place much importance on free market quotations as they represented a very narrow market. Total export and import figures were used, since it was thought that the appropriate value of the Uruguayan peso was shown in its trade transactions with all the world, and not the United States alone.

Section 303 of the Tariff Act of 1930, pursuant to which the countervailing duty in issue here was assessed, provides:

"Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

Under this statute, it has been held that multiple exchange rate systems can result in a bounty or grant. F. W. Woolworth Co. v. United States, 115 F. 2d 348, 28 CCPA 239, C.A.D. 151; V. Mueller & Co. v. United States, 115 F.2d 354, 28 CCPA 249, C.A.D. 152; Robert E. Miller & Co., Inc. v. United States, 34 CCPA 101, C.A.D. 349.

The Woolworth case involved an importation of chinaware from Germany in 1936. Ninety percent of the purchase price was paid by the importer in registered reichsmarks, each of which had been bought for $0.2142 United States currency. Ten percent was paid in so-called free reichsmarks, each of which had cost $0.4033 United States currency. The latter value had been arbitrarily declared by the German Exchange Control Board (a subsidiary of the Reichsbank) for the sale thereof in Germany. It was conceded that if the merchandise had been wholly paid for in free reichsmarks, the manufacturer would have received a bounty. As far as the manufacturer who received payment was concerned, there was no distinction between the free and the registered reichsmarks. The court held that a bounty had been bestowed, stating (28 CCPA p. 248):

"It is not possible to escape the conclusion from the record that the German Government by various devices and through different authorized governmental agencies was seeking to aid its manufacturers in invading foreign markets with their goods to compete in such markets with domestic producers. To this end various devices and practices were resorted to by and with the authority, encouragement, and aid of the German Government. Among such was the control of the registered marks and the limitations placed upon their use.

"As has been said, concededly a bounty would have followed the payment of the total purchase price in

free marks. It seems clear that, since the registered marks which were used became immediately worth the same to the manufacturer as free marks, the identical ultimate result in dollars and cents was obtained. In the one instance a direct bounty would have been paid; in the other the result was reached indirectly."

In the Miller case, the merchandise consisted of thumbtacks, also imported from Germany, in 1937. The goods were paid for in so-called Aski marks which were purchased at a lower price than the current value of free or gold reichsmarks. Under German regulations, Aski marks could be used in payment for exported goods and subsequent to such use were redeemed by the German Government at the same value as free reichsmarks, thereby enabling the German manufacturer to dispose of his goods at a lower dollar equivalent than he would otherwise charge. It was held that the merchandise was in the "bounty-fed" class and was subject to countervailing duty.

It has also been recognized internationally that multiple currency practices can in certain circumstances constitute a subsidy to exports which may be met by countervailing duties. Interpretative Notes to the General Agreement on Tariffs and Trade, ad Article VI, paragraph 2, 82 Treas. Dec. 305, T.D. 51802.

The "plain, explicit, and unequivocal purpose" of our countervailing duty statute was set forth in Nicholas & Co. v. United States, 7 Ct.Cust.Appls. 97, 106, T.D. 36426, affirmed 249 U.S. 34, 39 S. Ct. 218, 63 L.Ed. 461, as follows:

"Whenever a foreign power or dependency or any political subdivision of a government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a *result* Congress was seeking to equalize regardless of whatever name or in whatever manner or form or for whatever purpose it was done. The statute interprets itself as a member of an act calculated to maintain an accorded protection, incidental or otherwise, as against payments or grants of any kind by foreign powers, *resulting* in an equalization thereof to any extent directly or indirectly. * * * " [Italics quoted.]

At pages 113–114 of 7 Ct.Cust.App., the court stated further:

"Whatever may have been the purpose or consideration of the payment made upon exportation of these spirits, the incontrovertible fact is present that it necessarily encouraged their exportation and enabled the exporter to sell them at a proportionately less price in competition with the goods of this country. It is a payment directly to the exporter for and upon exportation and the entry of said goods in our body commerce. The doctrine of the case, therefore, may be paraphrased from the language of the Supreme Court in Allen v. Smith, supra [173 U.S. 389, 19 S.Ct. 446, 43 L.Ed. 741]:

"Whether allowed in consideration of services rendered or to be rendered, or with the object of a public interest to be obtained, production or manufacture to be stimulated, or a moral obligation to be recognized, it is a bounty."

In our opinion, the facts presented here support the Treasury Department's finding that, at the time of its decision, wool tops exported from Uruguay received bounties or grants within the meaning of section 303 of the Tariff Act of 1930.

One of the purposes of Uruguay's multiple rate of exchange system was to aid industries which needed assistance in order to place products abroad. Under such a system, which assigns different exchange rates to different commodities, some exports are favored over others. In the instant case, the record shows that wool tops were favored over many other commodities and that the manufacturer

was enabled to sell them to the United States profitably, which he could not otherwise have done. Wool tops produced in Uruguay were offered and sold at a proportionately less price in competition with domestically produced wool tops. The percentage of wool tops imported from Uruguay increased markedly between 1950 and 1953, which increase was vastly out of proportion to the general increase in imports of this commodity. By means of the exchange rate granted to wool tops, an inducement was offered for the exportation of wool in the form of tops rather than in the form of unmanufactured wool. The result was to increase seriously the importation of wool tops into this country from Uruguay and to permit their sale at lower prices in competition with domestically produced wool tops.

■ It is clear from the record in this case that the Treasury Department imposed the countervailing duty on wool tops only after careful consideration of the entire situation and after circumstances had changed sufficiently to show that the preferential exchange rate had given such an advantage to Uruguayan exporters as to constitute a bounty or grant within the meaning of section 303. Although the United States and other countries may have recognized or approved multiple exchange rate systems in general and although there may have been various causes for Uruguay's action, nevertheless, section 303 of our tariff act imposing countervailing duties in certain circumstances has not been repealed. It must be applied whenever it is shown that a bounty or grant has been bestowed. The fact that United States representatives on the International Monetary Fund and the National Advisory Council did not object to Uruguay's multiple exchange rate system in general is not relevant. Whether or not such a system is objected to, whenever the result is a bounty as to any particular article, the statute requires that countervailing duties be imposed. The facts here show that the preferential exchange rate did result in a bounty to the Uruguayan exporter.

■ Plaintiff also claims that the levying of countervailing duties in the instant case was a violation of the most-favored-nation clause of the trade agreement with Uruguay, since no countervailing duty was imposed on wool tops from Argentina. First, the record does not establish that Argentina's exchange system resulted in a bounty on wool tops. Second, as stated in defendant's brief:

"Since the application of the countervailing duty statute is dependent upon a determination whether in *any* given country a grant or bounty has been paid or bestowed directly or indirectly, upon the manufacture, production, or export of any article or merchandise, and since the situation in any given country is unique, any comparisons with action taken or not taken by the United States Government with regard to the imports from any other countries are *not* relevant." [Italics quoted.] [P. 30.]

The General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, under which the regular duties on the present wool tops were assessed, provides that countervailing duties may be imposed if not in excess of the estimated bounty or subsidy determined to have been granted, directly or indirectly, on the product.

Furthermore, it has been held that the imposition of countervailing duties does not violate the most-favored-nation clause. Balfour, Guthrie & Co. v. United States, 136 F.2d 1019, 31 CCPA 63, C.A.D. 249; Marion R. Gray v. United States, 70 Treas.Dec. 811, T.D. 48679; Douglas Fairbanks v. United States, 56 Treas.Dec. 371, T.D. 43643.

■ Plaintiff also claims that by levying countervailing duties on wool tops from Uruguay and by not levying them on wool tops and other products from other countries having multiple rate systems, its constitutional rights have been violated. Plaintiff itself contends that a

multiple rate system does not result in a bounty or grant in all cases. Other factors must be considered in order to determine whether the action of a foreign Government is, in fact, the bestowal of a bounty or grant. Such a determination was made in regard to wool tops from Uruguay but not in regard to other products from Uruguay or wool tops from other countries. There is nothing in the record from which the court could determine that countervailing duties could or should have been assessed in other situations. Under these circumstances, certainly, it cannot be held that the assessment of countervailing duties on Uruguayan wool tops is prohibited because such duties were not assessed on other merchandise.

■ Plaintiff's further argument that failure to comply with certain provisions of the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., 60 Stat. 237, invalidated the assessment of countervailing duties is controlled by the decision of the court of appeals in United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91, C.A.D. 771, to the effect that any procedural irregularity was waived by participating in the investigation without making timely objection. In the instant case, plaintiff had actual notice of the investigation and did, in fact, supply information on the matter.

■ Plaintiff complains further that the method used by the Treasury Department in determining the amount of the countervailing duty was unreasonable and arbitrary. It is evident that under the circumstances of this case it would have been difficult, if not impossible, to determine the exact amount of the bounty. Congress clearly had such a situation in mind when it provided that the Secretary of the Treasury shall ascertain and determine, or *estimate*, the amount. V. Mueller & Co. v. United States, 3 Cust.Ct. 139, C.D. 220, affirmed 115 F.2d 354, 28 CCPA 249, C.A.D. 152. In that case, the court pointed out (3 Cust.Ct. p. 143):

" * * * When a foreign country has declared a bounty or a fixed amount, by a statute, the Secretary can readily 'ascertain and determine' the amount thereof and can so declare as, for instance, the rate of duty imposed by Belgium on motorcars or the rate of duty imposed by Germany on cardboard, etc. (T. D. 41934), but where the bounty or grant is made through or by means of a manipulated currency, for instance, then the Secretary must resort to the other direction in the statute, viz., 'he shall from time to time * * * estimate the net amount of each such bounty or grant, and shall declare the net amount so * * * estimated.' "

In the instant case, the estimate was made by taking account of all merchandise transactions for which the Uruguagan peso might be used, including merchandise transactions in the free market, and the amount of exchange actually bought and sold at the rates applicable to the transactions. From this, a representative rate was found which was used as a base for estimating the countervailing duty. It is clear from the record that this was not done arbitrarily or capriciously but that the action was based on extensive studies and on available statistics on exchange rates and trade.

It has long been held that the finding of the Secretary of the Treasury as to the amount of a bounty is final and not subject to judicial review. Downs v. United States, 4 Cir., 113 F. 144, affirmed 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275; Franklin Sugar Refining Co. v. United States, 3 Cir., 178 F. 743, 19 Treas.Dec. 347, T.D. 30494; Franklin Sugar Refining Co. v. United States, 1 Ct.Cust. Appls. 242 T.D. 31276.

In the first Franklin Sugar Refining Co. case, the court stated:

" * * * It is the province of the Secretary of the Treasury, under the act, 'from time to time to ascertain, determine, and declare' the amount of the bounties granted; and when this is done by the Secretary his finding and declaration of the same

are binding upon the collector, the Board of General Appraisers, and the courts, and no evidence will be admitted upon a hearing before any of these tribunals to contradict the determination of the Secretary. If the importer feels that an injustice has been done, his remedy is by appeal to the Secretary of the Treasury.

"It was undoubtedly the intention of Congress, in the enactment of this section, that the findings of the Secretary as to the amount of bounties paid by the foreign countries and collectible upon importation of merchandise as a countervailing duty should be final so far as any revision or examination by the courts is concerned. We see no difference between this provision of the act of 1897 and that section in the various tariff acts which requires the Secretary of the Treasury to proclaim the values of foreign coins after they have been ascertained by the estimate of the Director of the Mint, in so far as the finding of fact is to be regarded as binding upon the courts under this provision.

"As to the values of foreign coins, the Supreme Court in four cases, to wit, Arthur v. Richards, 90 U.S. 259, [23 Wall. 246, 259, 23 L.Ed. 95]; Cramer v. Arthur, 102 U.S. 612, 26 L.Ed. 259; Hadden v. Merritt, 115 U.S. 25, 5 Sup.Ct. 1169, 29 L.Ed. 333, and U. S. v. Klingenberg, 153 U.S. 93, 14 Sup.Ct. 790, 38 L.Ed. 647, declared that the finding or estimate of the Director of the Mint, as proclaimed by the Secretary of the Treasury was binding, not only upon the collector, the Board of General Appraisers, but upon the courts as well, and we have no doubt it was the intention of Congress that, in the matter of the collection of the countervailing duties, the amount fixed by the Secretary of the Treasury to be collected on importations cannot be inquired into by the courts, but must be set-

tled as declared by the Treasury Department. If there has been a mistake, the remedy is by appeal to the Secretary. In case that has not been done, the courts cannot admit evidence for the purpose of inquiring into the question as to whether the amount fixed by the Secretary was or was not correct." [19 Treas.Dec. 347, 350, T.D. 30494.]

In accordance with this principle, it has been held in recent cases that the determination of the rates of exchange of foreign currency by the Federal Reserve bank is within the bank's discretionary power and is not reviewable by the courts. Barr v. United States, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765; Armand Schmoll, Inc. v. United States, 37 CCPA 56, C.A.D. 420; Amalgamated Textiles, Ltd. v. United States, 24 CCPA 74, T.D. 48378.

In view of these decisions, the Secretary's determination of the amount of countervailing duty to be imposed on wool tops from Uruguay is final and is not subject to review here.

For the reasons stated, the protest is overruled. Judgment will be entered accordingly.

RICHARDSON, Judge (dissenting).

The principal question which is presented by the evidence in this record, as I see it, is whether a bounty or grant was paid upon the production and exportation from Uruguay of the wool tops covered by the involved entries in the proceeds received by the exporter from the sale of his foreign exchange under the multiple exchange rate system in vogue in Uruguay at the time such merchandise was exported to this country. The majority have reached the conclusion that a bounty or grant was paid on the proceeds which the exporter received from the surrender of his foreign exchange to the extent that the rate of exchange applicable to this merchandise exceeded the "average exchange rate" of 1.86 pesos to the United States dollar. I cannot agree with this conclusion. In my opinion, the evidence of record does not es-

tablish the existence of a bounty or grant upon the exchange proceeds derived by the Uruguayan exporter of wool tops to this country.

In order that no inference be drawn from a reading of the majority opinion that the multiple exchange rate system in Uruguay was an invention of recent origin that was devised to catapult Uruguayan products abroad, it should be noted, at the outset, that Uruguay has had a multiple currency system since 1931,[1] and that, as of the time that the involved merchandise was exported, Uruguay had not established an initial par value for its currency.[2] This currency system antedated by two decades the advent of the wool tops importations here involved. Consequently, it can hardly be said that subsidization of the wool tops industry was an underlying motive for the creation by Uruguay of its multiple currency system. And, prior to 1953, this very currency system now under attack had been vigorously defended by the Treasury Department against a claim emanating from domestic wool manufacturers that the preferential exchange rate governing the exportation of wool tops from Uruguay was productive of a bounty.[3] Our Tariff Commission reported, in 1948, that profits from Uruguay's exchange control operations constituted *an important source of Government revenue,* amounting, in 1939, to 15 percent of Uruguay's income.[4] And the basis of the Treasury Department's earlier defense of the Uruguayan multiple currency system was that its rates were manifestations of an internal revenue system.[5] I do not see in the evidence before us the emergence of any factors not previously considered by the Treasury Department, and sufficient to justify its change of position.

In giving support to the Treasury Department's reversal of position, the majority have referred to the Uruguayan basic decree of September 25, 1947 (plaintiff's collective exhibit 6), in noting its provision that "the Executive might grant preferential exchange treatment consisting of the establishment of exchange rates varying between 1.519 and 1.78 pesos per dollar 'for industries which need it in order to place their products abroad.'" It will be seen, however, that the spread of export exchange rates encompassed within this decree had not varied from the spread of export rates which were in existence in Uruguay for several years prior to the promulgation of this decree.[6] And the decree itself did not embrace any consideration of the wool tops industry because such industry was nonexistent in Uruguay at that time. At the time here involved, the spread of export exchange rates in the controlled segment of Uruguay's multiple currency system ranged from 1.519 pesos to the dollar for unprocessed goods to 2.35 pesos to the dollar for processed goods. Wool tops, the merchandise with which we are here concerned, is a semiprocessed article, the exportation of which was governed by the exchange rate of 2.15 pesos to the dollar. The wool tops rate represented a combination of the two basic export rates, namely, 76 percent at 2.35 pesos per dollar, and 24 percent at 1.519 pesos per dollar.

There also was a free exchange rate in Uruguay which, at the time in question, averaged around 3 pesos to the dollar. This rate also governed the exportation of some of Uruguay's products. The ma-

1. Tariff Commission Report on Economic Controls and Commercial Policy in Uruguay (1948).

2. International Monetary Fund Report (1952–1953); National Advisory Council Report (1952–1954), p. 16, H.Doc. 490, 83d Cong., 2d sess.

3. House Ways & Means Comm. Hearings, H.R. 1535, 82d Cong., 1st sess., pp. 685–691.

4. U.S. Tariff Comm., Economic Controls and Commercial Policy in Uruguay (1948), p. 8.

5. House Ways & Means Comm. Hearings, H.R. 1535, p. 690, 82d Cong., 1st sess.; Senate Finance Comm. Hearings, H.R. 5505, p. 270, 82d Cong., 2d sess.

6. IMF Financial Statistics (1947–48), pp. 106–107.

jority have made a point of noting, although the decrees do not so indicate, that the wool tops exporters were permitted to retain 5 percent of their dollars which could be sold at the prevailing free rate. But what the majority have not indicated, and what is established in the evidence, is the fact that one of Uruguay's chief meat industries, namely, the cattle industry, was conducted entirely at the free exchange rate level. Thus, the decree of April 15, 1953, pertaining to beef exports, states (plaintiff's collective exhibit 5):

> "Article 1.—Prices of all types of cattle which are marketed at the National Stockyards and in the 'Frigorifico Anglo de Fray Bentos' are subject to the law of supply and demand."

The exchange rate governing the involved exportations was preceded by a number of fiscal events of international significance, the importance of which cannot be overlooked in the total appraisal of currency controls as a basis of subsidization of exports, if we are to put the Treasury Department's criterion in proper perspective. One such event was the emergence, in 1945, of the International Monetary Fund, of which organization the United States and Uruguay were charter members.[7] One of the principal purposes of the Fund is "To promote exchange stability, to maintain orderly exchange arrangements among members, and to avoid competitive exchange depreciation." Thus, through participation in the Fund, Uruguay gained multilateral recognition and support for its currency system and practices from Fund members which, of course, included the United States. It is said that in the matter of foreign exchange controls "the Bretton Woods agreements have somewhat enlarged the field of recognition."[8]

In the light of this development, it is difficult to understand how the majority could brush aside United States participation in the Bretton Woods agreements as being irrelevant to this matter of subsidization through currency manipulation, and prefer to follow the holdings in the Woolworth, Mueller, and Miller cases instead. The International Monetary Fund and the United States, acting through the Secretary of the Treasury and others constituting the National Advisory Council on International Monetary and Financial Problems, gave approval to Uruguay in no uncertain terms for the use of the multiple exchange rates governing its imports and exports.[9] This attitude was not formulated in a vacuum. It was formulated with a conscious awareness of the impact of such currency reforms on all phases of American activities of an economic and fiscal nature involving intercourse with Uruguay in such matters.[10] Indeed, the Treasury Department's earlier defense of Uruguay's currency system against the claim here made was based upon knowledge and information derived from United States participation in Fund activities and investigations of monetary activities of Fund members. The Woolworth, Mueller, and Miller cases, which have apparently influenced the majority opinion, are representative of an earlier era, and do not involve multiple exchange rate currency systems. These cases deal with dual rate currencies which at the concluding phase of an export transaction possessed but a single value. Unlike the currency system here involved, these systems were supported by only the unilateral action of the German Government and were regarded as being offensive to our antisubsidy tariff laws. These cases constitute an inappropriate standard by which we must resolve the issue before us in the instant case.

Another fiscal event which preceded the involved exportations was the devaluations of October 5, 1949. These devaluations directly influenced the rate which was later to govern the exporta-

7. 60 Stat. 1401.

8. Nussbaum, Money In The Law (1950), p. 475.

9. H.Doc. 611, 81st Cong., 2d sess., p. 17.

10. See Executive Order No. 10033, Feb. 8, 1949, 14 F.R. 561.

tion of the involved wool tops. These adjustments in exchange rates are partially reflected in the decree of October 5, 1949, which was received in evidence in the instant case (plaintiff's collective exhibit 5). They have been summarized in the Financial Statistics Report of the International Monetary Fund for the month of October 1949 as follows (p. 186):

"Prior to October 6, 1949 those export proceeds now sold at the rate of 1.78 had been sold at the rate of 1.519 or 1.70 pesos per U.S. dollar. Those exporters now eligible for pesos at the rate of 2.35 formerly sold their proceeds at rates of 1.70, 1.78, or 1.88 and those imports for which exchange is now available at 2.45 were formerly eligible, in most cases, for exchange at 1.90 pesos per dollar."

The devaluations of October 5, 1949, did not originate with Uruguay. Uruguay, in its turn, reacted to the round of devaluations that was precipitated by the devaluation of the British pound sterling in September 1949 and the sweeping devaluation of the Argentine peso which followed.[11] The United States recognized the necessity for Uruguay's devaluations and approved of them.[12] Prior to the October 5, 1949, devaluations, wool tops exports had been assigned preferential export rates of first 1.78 pesos per United States dollar on September 25, 1947, and then 1.88 pesos per dollar in September 1949, according to information compiled by our Tariff Commission from foreign service reports and statistics of the International Monetary Fund.[13] Nevertheless, both sides concede the fact that, during this period, wool tops exports to the United States from Uruguay were negligible.

As a result of the October 1949 depreciations in Uruguay, the wool tops export rate was changed from 1.88 pesos per dollar to 2.35 pesos per dollar. The period between this rate adjustment and the exportation of the involved merchandise witnessed only an appreciation of the wool tops rate as against the dollar. But the fact remains that it was only natural and logical for the October 1949 devaluations in Uruguay to result in the placement of wool tops in the highest exchange rate stratum of Uruguay's controlled export rates, in view of this commodity's location at the apex of that structure in the pre-October 1949 era. But, curiously enough, while the Treasury Department has recognized the almost universal need for currency devaluation among trading nations in the wake of the pound sterling devaluation of September 1949, nevertheless, the Treasury Department has, in the case of Uruguay, calculated the "benchmark" for the rate governing that country's wool tops exports at a lower level in Uruguay's multiple exchange rate structure than that to which this commodity was assigned before the October 1949 depreciations.

This brings me to a consideration of the Treasury Department's calculation of the "benchmark," or formulation of the weighted average of 1.86 pesos to the dollar, which is all that stands between that Department's earlier decision negating the existence of a subsidy in Uruguay's wool tops rate, and its later decision finding one. In my opinion, the "benchmark" theory is an arbitrary method that was used by the Treasury Department to put a value on Uruguayan currency, albeit for but a single commodity, under circumstances where that Department was of the opinion that Uruguay had no parity for its currency, and possessed no feasible basis for the establishment of one.[14] And as this theory was applied to the Uruguayan currency system, it possessed certain apparent fallacies.

While it may have been expedient for the Treasury Department to have utilized

11. IMF Report (1950), pp. 28, 46–48.

12. NAC 2d Special Report, H.Doc. 611, 81st Cong., 2d sess., p. 17.

13. Senate Finance Comm. Hearings, H.R. 5505, 82d Cong., 2d sess., p. 263.

14. NAC Report (1952–54) H.Doc. 490, 83d Cong., 2d sess., p. 16.

the total Uruguayan import-export figures for 1951 together with the exchange rates in use in Uruguay in 1953, in the absence of available import-export totals for the current year, in order to ascertain the "average rate" at which it was proper for the dollar proceeds from the involved merchandise to be converted into Uruguayan pesos, such use, would, nevertheless, in the absence of more current export-import figures, have to be made at the risk and expense of accuracy, even assuming that the exchange rates remained constant during both periods. It is not unlikely that the commodity classifications within even these static rates might shift from year to year, so that the average level at which the export-import trade was conducted in 1953 might not be at the same level at which such trade was conducted in 1951. As such, the so-called "average rate" in the current year (1953) would be at variance with the "average rate" for the test year (1951). It has not been shown in the record before us that this was not the case for the year in which the involved merchandise was imported. Taking into consideration the rather flexible nature of the multiple exchange rate system under review, the ascertainment of such data for the current year would appear to be essential before any meaningful "average rate" could be arrived at. Particularly so, in view of the fact that commodity classification shifts as opposed to exchange rate adjustments are often deemed to be desirable among nations that employ multiple currency structures.[15]

The "benchmark" theory has other limitations. In order to ascertain what is tantamount to the "par value" of a particular foreign currency under this theory, the exporting country whose currency is under review is required or expected to be atuned only to the pulse of its past economic activity. This would seem to run counter to normal monetary practice which tends to estimate the value of a currency in terms of present or anticipated economic, political, and social conditions of a given country.

Furthermore, the application of this theory is vulnerable to the argument that the various rates imployed in the multiple exchange rate system seemingly have no correlation to each other. A closer examination of the preamble to the Uruguayan decree of September 25, 1947 (plaintiff's collective exhibit 6), leads to the conclusion that the rates were fixed for various commodities, each with a view toward its particular importance to the national economy in an international setting. But inherent in the application of the "benchmark" theory is the divorcing of the exchange rates from the conditions which give them birth and meaning, for the single purpose of relating one rate over against another rate to find an "average rate."

The comparison of one distress rate with another one for the purpose of establishing the parity of a currency is bound to lead to consequences which are unfair, unjust, and inequitable. Indeed, some of the lawmakers who were most concerned at the outset with prospects for levying countervailing duties on importations of wool tops from Argentina and Uruguay were inclined to question the propriety of this "benchmark" theory.[16] And judicial support for such theory ought not be maintained in the face of Treasury action which resulted in the utilization of this theory for the imposition of a countervailing duty against importations of wool tops from Uruguay, but not as against Argentinian wool tops importations of that period. And this, notwithstanding the fact that it was the Argentinian wool tops importations into this country in large quantities which first gave rise to public clamor for the imposition of countervailing duties to offset the multiple exchange rate prac-

15. Behrman & Schmidt, International Economics (1957), p. 308.

16. Senate Finance Comm. Hearings, H.R. 5505, pp. 18–25, 251–253, 82d Cong., 2d sess.; Senate Finance Comm. Hearings of Feb. 17, 1959, 86th Cong., 1st sess., pp. 5–38.

tices which supported these importations;[17] and notwithstanding the further fact that the October 1949 devaluations which preceded the Uruguayan wool tops importations were, in large measure, initiated by widespread multiple currency changes adopted by Argentina, who, not being a member of the International Monetary Fund, was subject to no external surveillance or control in its currency practices as was Uruguay. Uruguay, at least, gained "most favored nation" treatment and bilateral recognition of its multiple currency system in the reciprocal trade agreement which it concluded with the United States on July 21, 1942.[18] And in the face of this preferential treatment of Argentina, it is a small wonder why we should find numbered among the plaintiff's claims in the instant case a claim of violation of this "most favored nation" clause with respect to countervailing duties.

Finally, on the matter of the "benchmark" theory, I cannot perceive how an accurate analysis of the Uruguayan monetary system could be made, or a meaningful approximation of the parity of Uruguayan currency be achieved, without a consideration of the fluctuating free exchange rate more extensive and thorough in scope than that which the Treasury Department undertook in the application of this theory. "The free market rates will, to some extent, influence the proclaimed rates prevailing in the exchange control segment of the national economy, and will generally press toward greater flexibility of the system." [19] I am not convinced that the parity of Uruguayan currency operated at or below the levels of the controlled segment of the monetary system. There is some doubt in my mind as to the "reality" of the controlled exchange rates in terms of the par value of the currency,

in view of the fact that currency controls were introduced into Uruguay for the express purpose of raising revenue for the Government, among other reasons, and in view of the fact that the existence of the fluctuating free rate antedated the advent of currency controls in Uruguay in 1931, and has been utilized in commodity transactions in varying degrees even since the inception of currency controls.[20] And under the International Monetary Fund operations currency controls, such as those employed in Uruguay, are regarded as being only "transitory expediencies."

The steady movement toward the emergence of the free rate as a currency basis has been manifest in the multiple currency practices of some of Uruguay's neighbors in Latin America. For example, in Brazil, the free market which was originally used for certain invisible transactions was broadened in 1953 to include various trade transactions.[21] Ecuador transferred some exports and imports under its multiple rate system to the free rate.[22] And, in Peru, the official rate was abolished on November 12, 1949, foreign exchange control was removed, residents were given all monetary liberties, and the fluctuating free rate became the currency basis.[23]

This trend in the use of the free rate strengthens the prospects for the expansion of the role of the free rate in currency matters in Uruguay upon the gradual relaxation of currency controls in that country. Already it will be noted that under the fluctuating free rate there is a unification of both the buying and selling rates. Moreover, the Uruguayan Government has itself exhibited confidence in the free market rates through governmental intervention from time to time to stabilize the rates.[24] And it will be observed that the fluctuating free

17. Senate Finance Comm. Hearings, H.R. 5505, 82d Cong., 2d sess., pp. 18–24.

18. 56 Stat. 1624, 1630; T.D. 50786.

19. Nussbaum, Money In The Law (1950), p. 455.

20. T.D. 52291.

21. NAC Report (1952–54) H.Doc. 490, p. 15.

22. NAC Report (1951–52) H.Doc. 523, p. 24.

23. Pick, Currency Yearbook (1959), p. 277.

24. IMF Report on Exchange Restrictions (1950), p. 118.

rate has remained consistently at a more depreciated level than any of the rates in the controlled segment of Uruguay's monetary structure. Consequently, the arguments which favor the application of the "benchmark" theory in the ascertainment of the parity of Uruguay's currency are not persuasive in the face of circumstances which strongly indicate at least on the export side that the exporter of merchandise from Uruguay would normally receive more pesos for his foreign exchange in a free and unrestricted market than he could possibly obtain in a controlled exchange market. This is due to the fact that the raising of revenue for governmental use was one of the chief functions of the exchange system in Uruguay as of the time the involved merchandise was exported. The spread of rates on the export side of the exchange was systematically established at less depreciated rates than were the rates maintained on the import side of the exchange, with both sets of rates being less depreciated than were the unified free market rates, thus enabling Uruguay, as the Government's witness, Mr. Wagner, puts it, to buy "foreign exchange cheap" and to sell "it dear."

In the matter of export subsidies, it does not appear that Uruguay was as subtle or as cryptic in the manner or method of their bestowal as is implicit in the use of preferential export exchange rates. In no uncertain language, Uruguay bestowed by decree both direct and indirect subsidies on its exports whenever in the opinion of the Government such action was warranted in order to stimulate the exportation of designated commodities. The decree of January 24, 1951, pertaining to the exportation of frozen mutton to Greece, states (plaintiff's collective exhibit 5):

"*Article 1.*—There is hereby fixed a rate of 1.78 pesos per dollar, or the equivalents thereof in other currencies, plus a premium of 0.12 peso, which will be paid and settled directly by the Bank of the Republic, chargeable to the 'Foreign Exchange Benefits' ['Beneficios de Cambio']

Account, in order to finance exports of frozen mutton."

The decree of February 18, 1953, pertaining to the exportation of footwear and hides and skins, states (plaintiff's collective exhibit 5):

"*Article 1.*—There is continued, during the course of the current year, the premium of .25 peso per dollar, or the equivalents thereof in other currencies, established by decree of February 20, 1952, for exports of national tanned cattle hides and sheepskins, finished; national tanned cattle hides without color, paint and luster finish; national tanned, dyed cattle hides without paint and luster finish; and footwear made with national leather.

"This treatment will be enjoyed by all transactions reported to the Controller of Exports and Imports in the period from January 1 through December 31, 1953, provided that the corresponding foreign exchange is sold within that time limit."

And the decree of April 15, 1953, previously referred to herein in connection with the establishment of free market prices for cattle, states (plaintiff's collective exhibit 5):

"*Article 2.*—An additional [premium of] 100.00 pesos (one hundred pesos) per ton is fixed for all frozen beef and 30.00 pesos (thirty pesos) per ton for all chilled beef exported to the United Kingdom.

"*Article 3.*—At the time of the actual negotiation [sale] of the foreign exchange from exports made under the provisions of the foregoing article, the Bank of the Republic shall pay the respective additional premiums, the amount of which it will advance on account of the sale of the foreign exchange [proper] turned over [to it], by way of the corresponding settlement."

The foregoing constitute examples of Uruguay's direct export sibsidies.

Examples of Uruguay's indirect export subsidies are to be found in the following

excerpts from its laws and decrees pertaining to wool exports. Law No. 11,823 of May 16, 1952, states (plaintiff's collective exhibit 5):

"*Article 1.*—Wool in the grease and [or] washed wool reported in sworn declarations filed with the Controller of Exports and Imports from May 9 until July 31, 1952 * will be exempted from all taxes, duties and charges [imposts] on the marketing and exportation thereof except those intended for the Rural Pension and Retirement Fund (Law No. 11,617 of October 20, 1950), the Compensation Fund for Workers in Consignment Stores and Warehouses for Wool, Hides, [skins] and Related Products (Law No. 11,537 of October 6, 1950) and the taxes [charges] provided by Laws No. 11,199 of December 27, 1948 (Sheep Mange) and No. 11,453 of July 3, 1950 (Honorary Ovine [Sheep] Improvement Commission)."

And the decree of May 27, 1952, states (plaintiff's collective exhibit 5):

"*Article 2.*—Exports of washed wool shall be benefited by the same tax abatement ['desgravación'] as wool in the grease, to the extent necessary to complete the amount of that exemption, according to the proportion of wool in the grease to washed wool.

"*Article 3.*—For purposes of repayment of such abatement as may be granted for exports of washed wool, the Bank of the Republic will proceed to make delivery, to the respective exporters, of the corresponding amount against the debit of the 'Exchange Differences' Fund."

Uruguay has, with commendable candor, made full disclosure of such export subsidies to the International Monetary Fund from time to time.[25] And if any of the subsidies described in the foregoing laws and decrees had, in fact,

governed the exportation of the involved merchandise, we would, of course, be obliged to regard them as bounties or grants under settled principles of law. Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461; Downs v. United States, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275. But no reason has been shown in the proofs before us why the Uruguayan exchange rates themselves, particularly the rates for wool tops exports, should be regarded as carriers of subsidies.

In my opinion, the evidence militates against the existence of a subsidy in the export exchange rate assigned to Uruguayan wool tops. There is no evidence of price discrimination or price slashing such as one might expect to find in a bounty-fed transaction. The Uruguayan exporter was unable to sell wool tops for exportation at prices below those which his Government regarded as being fair market prices. Thus, we find that, in nearly every instance with respect to the involved importations, the invoice prices —prices on which the exchange regulations operated—were above the values as found by the appraiser, resulting in the reduction of values for duty purposes. It is apparent that this factor, apart from any other, did not subserve the interests of subsidization. It did, however, subserve the interests of the Uruguayan Government in providing a broader exchange base from which to derive maximum revenues.

It appears that Uruguay's wool tops prices were world prices, that is, they were the same both for home consumption and for export, whether to the United States or to any other foreign country. The exchange rate for wool tops was the same whether the tops moved abroad to the United States or to any other country. But even if it could be said that Uruguay's world prices were below the prices of wool tops in the American market, still this factor in and of itself would not be alarming under

---

* Time limit extended to March 31, 1953 by laws of August 11, October 9, and December 2, 1952.

25. IMF Report on Exchange Restrictions (1951), p. 151.

624

the facts before us. Of course, the Government places much reliance upon price disparity between Uruguayan wool tops prices and the prices for domestic tops of the same period in support of the premise that Uruguayan wool tops exportations were subsidized. But the dangers of reliance upon price disparity, assuming without deciding that such was the case here, has been called to our attention and epitomized in the majority report of the Tariff Commission for the period under review, which reads:

"The apparel wools offered for sale, both in foreign and domestic markets, vary greatly with respect to many qualities, such as diameter and length of fiber, color, luster, elasticity and suppleness. Wools are prepared for market with various degrees of care and preliminary processing. Prices are quoted sometimes in terms of wool in the grease and sometimes in terms of clean fiber content; moreover, wool is not always delivered in the state of preparation on which the quotation is made. For example, wool may be sold in the grease but on a basis of its clean-fiber content, the 'shrinkage' allowance being arrived at by buyer and seller in a variety of ways.

"There is a wide variation in the purchase arrangements which domestic buyers employ in acquiring wool. These depend principally on the types of wools bought, their countries of origin, and the scale of operations of the wool buyer. There is also widespread variation in the lag between the time a domestic mill commits itself to the price it will pay for the wool it uses and the time it will actually receive the wool; by the time the wool is received, prices may have changed appreciably. A further complicating consideration is that price commitments may be in terms of foreign currencies that fluctuate considerably in relation to

the United States dollar. The prices at which much foreign wool is imported directly by American mills are not publicly reported. Also, there is considerable difficulty in making proper price allowances for differences in the preparation of foreign and domestic wools.

"From these factors, as well as a multiplicity of others, it is apparent that even the most commonly used comparative price quotations (which at best are based on averages of constantly changing volumes of sale) for domestic and foreign wools do not provide a sufficient guide for the buying operations of domestic users of wool. * * * " [26]

Under the evidence before us, price disparity, if any there be, could well be attributable to the dissimilarity of the commodities which resulted in the downgrading of the Uruguayan product as being inferior by our standards of production. Indeed, even the Government's own witness suggested as much. Consequently, under such circumstances, it would be unreasonable to expect Uruguayan wool tops to command as high a price in our markets as our domestic tops.

Furthermore, we cannot overlook the distortion of the wool tops picture for the period under review which, in my opinion, was brought about through the interposition of American private capital. As I have earlier pointed out, wool tops exports from Uruguay consistently enjoyed a preference in the scale of rates both before and after the devaluations of October 1949. But it was only subsequent to the October 1949 devaluations in Uruguay that wool tops began to and did move to this country in large quantities from Uruguay. And it is also apparent from the evidence that, during this period, there also was a coincidence of timing between the influx of wool tops to this country in large quantities, and the intervention of American private

26. U.S. Tariff Comm., Report on Wool, Wool Tops, and Carbonized Wool (Feb. 1954), pp. 17–18.

capital not only in the distribution of Uruguayan wool tops, but in their production as well.[27] Certainly, the movement of tops to our markets from Uruguay was influenced to some extent, for whatever reasons, by such capital. This is clearly evident in the testimony offered by witnesses of both parties herein. Under such circumstances, the responsibility for this movement of wool tops cannot properly be attributed to or laid at the doorstep of Uruguay and its multiple exchange rate structure. While the heavy movement of wool tops to the United States after 1949 deserves our most careful scrutiny with respect to the ascertainment of the cause therefor, nevertheless, I cannot envisage the subsidization of that commodity as being the procuring cause of such phenomenon, in the face of facts and evidence which, to my satisfaction, dictate otherwise.

In evidence before us also are decrees and customs information exchange bulletins pertaining to the multiple exchange rate currency systems of Argentina, Brazil, and Spain in effect during the period in question, none of which have been regarded by the Treasury Department as being bounty-fed insofar as exchange rates are concerned (plaintiff's collective exhibits 8, 9, 12, and 13; plaintiff's exhibits 10 and 11). By comparison, Uruguay's exchange rates are no less innocuous than the rates depicted in these other multiple currency structures. But, for some unknown reason, Argentina, whose unilateral currency practices stood squarely behind the initial heavy influx of wool tops into this country, has escaped the condemnation of its currency system which has been visited upon its neighbor, Uruguay, by our Treasury Department. And Spain, like Argentina, was not at the time in question a member of the International Monetary Fund, in consequence of which its currency manipulations were also not subject to multilateral inquiry. Yet, that

country too has enjoyed a measure of immunity from Treasury Department displeasure over its currency manipulations. On October 21, 1948, the Secretary of the Treasury issued T.D. 52074, which imposed a countervailing duty of 25 cents a pound on almond nuts exported from Spain to offset a direct subsidy of that amount that was found to have been paid by the Spanish Government upon the exportation of almonds to the United States in 1948. Spain then instituted, in November 1948, a multiple exchange rate system under which its official rate was pegged at 10 pesetas to the dollar while the exchange rate for almond exports was fixed at 19.75 pesetas per dollar.[28] In the face of this multiple exchange rate system, the Treasury Department concluded that a subsidy no longer supported almond exports to the United States and, accordingly, issued T.D. 52604 on November 15, 1950, revoking the countervailing duty levied on almond imports from Spain, retroactive to November 25, 1948. It is not surprising to learn, however, that it has been argued that the preferential rate assigned to almonds by the Spanish Government under its multiple exchange rate system represented a disguised subsidy equal to the direct bounty which had theretofore been paid by the Spanish Government on the exportation of almonds to the United States.[29] In any event, the change in position of the Treasury Department on the matter of multiple currency controls as a basis for export subsidies cannot be supported on the record, in the instant case, on so precarious a premise as its "benchmark" theory.

On the basis of the evidence, I do not think that the selection of exchange rates by Uruguay at varying levels to govern the exportation of its commodities constitutes a subsidization of certain commodities. The degree of encouragement fostered by such selection under a monetary structure which had no par value

27. Senate Finance Comm. Hearings, H.R. 5505, 82d Cong., 2d sess., pp. 209–212.

28. C.I.E.—471/49, Dec. 9, 1949.

29. House Ways & Means Comm. Hearings, H.R. 1535, 82d Cong., 1st sess., pp. 575–576.

for its currency, and no feasible basis for the establishment of one, is, in my opinion, reflective only of that country's estimate of the relative values which such commodities bore to its national economy. The circumstances attendant upon the instant case which impel me to such conclusion are, namely, (1) the multilateral support of Uruguay's currency system and approval of exchange rate adjustments made therein by the United States and other nations; (2) the time-honored use by Uruguay of multiple exchange rates for internal revenue purposes, among others, long before the advent and development of the wool tops industry in Uruguay; (3) the questionable character of the controlled segment of Uruguay's currency structure as being its currency basis in view of the transitory nature of such controls; (4) certain palpable fallacies inherent in the theory employed by the Treasury Department to approximate the worth of Uruguayan currency; (5) the utilization by Uruguay of other methods to bestow direct and indirect subsidies upon certain of its exports; (6) the downgrading in quality of Uruguayan wool tops in relation to domestic wool tops as being indicative of the comparative prices and values; (7) the uniformity of prices at which Uruguayan wool tops were offered for sale in markets abroad, whether in the United States, or elsewhere; (8) the emergence of American private capital as a factor in the stimulation of Uruguayan wool tops exports to the United States in large volume; and (9) the ameliorative and assimilable nature of Uruguay's multiple currency structure in comparison to the unilateral and somewhat clandestine multiple currency structures of other nations not regarded by the Treasury Department as being bounty-fed. For these reasons, I find that no bounty or grant was paid or bestowed upon the exportation from Uruguay of the involved merchandise, and that, accordingly, the imposition of countervailing duties under the entries covered by the instant protest was not warranted.